**UNITED STATES of America, Plaintiff,**

**v.**

**Ritchardas VASILIAVITCHIOUS,**
**Defendant.**

**No. 94–CR–746.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 13, 1996.

Leonard Crown Goodman, Sheldon M. Sorosky, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Ritchardas Vasiliavitchious is charged with conspiracy to export stolen cars from the United States and to possess stolen cars that had crossed state lines, aiding and abetting, exportation of stolen cars and possession of stolen cars. He says his arrest and his statements to the police are violative of the Fourth, Fifth and Sixth Amendments to the United States Constitution. None of the facts, save defendant's comprehension of and facility in English, are now in dispute.

### Facts

The government of Latvia notified United States Custom officials that two 40 foot shipping containers, exported from the United States, had contained four stolen automobiles. The commercial shipping company told Customs officials that it leased the containers to a company called Europe Import Co. in Rolling Meadows, Illinois where the shipment originated. It said the containers were loaded at the Shurguard Storage facility in Rolling Meadows.

Customs then learned that Europe Import Co. had leased unit # 19–26 at the Shurguard Storage facility and that a person using the name John Johnson had paid all back rent for the unit. John Johnson was later identified as Martinas Chpokas, now charged as a co-conspirator. Chpokas drove a red/maroon Chevrolet Caprice and was accompanied by two individuals when he paid the rent for the units.

Soon after, law enforcement officers observed Vasiliavitchious drive the same red/maroon car, escort two late model luxury Mercedes Benz automobiles to the Shurguard Storage facility, unlock storage unit # 19–26, put the Mercedes Benz cars inside and then lock the storage unit.

On November 19, 1994 law enforcement officers observed Chpokas, Vasiliavitchious, and a third person, Igor Fomin, meet near storage unit # 19–26 at the Shurguard facility. Vasiliavitchious talked with Chpokas and handed him what appeared to be keys and cash and then left.

About an hour and a half later, a 40 foot shipping container arrived at the storage facility. Still later that evening, Chpokas loaded one of the cars from the storage unit into the container. Chpokas and Fomin were then arrested at the facility.

That same night law enforcement officers went to Vasiliavitchious' home to arrest him without a warrant. The officers knocked on Vasiliavitchious' apartment door and identified themselves as police officers. Vasiliavitchious opened the door and stood in the open doorway of the apartment. The officers falsely told him that a man had broken into his car and directed him to come down to the parking lot to see if any item was missing from his car. This tactic was deliberate and designed to allow officers to make the arrest well away from Vasiliavitchious' home. Vasiliavitchious believed the lie and followed the officers to the parking lot where he was arrested.

Following Vasiliavitchious' arrest, the officers advised him of his *Miranda* rights in English and proceeded to interrogate him on the way to the police station. After arriving at the Rolling Meadows police station, the officers advised Vasiliavitchious of his *Miranda* rights a second time and proceeded to interrogate him further. On December 21, 1994 there was a finding of probable cause made against Vasiliavitchious, but the criminal complaint was subsequently dismissed without prejudice on March 30, 1995.

On August 4, 1995 Vasiliavitchious was charged again in the same matter and a warrant was issued for his arrest. Later that day, Special Agent Brandon Davies arrested Vasiliavitchious, who was walking his dog, outside his home. Davies immediately advised him of his Miranda rights in English. Davies transported Vasiliavitchious first to the Des Plaines Police Department to be fingerprinted and photographed and then to the U.S. Marshals Service for processing and arraignment. He was finally transported to the Metropolitan Correctional Center (MCC). Davies and Vasiliavitchious engaged in conversation during each transport.

Vasiliavitchious says his arrest on November 19, 1994 violated his Fourth Amendment rights and his post-arrest statements should be suppressed as fruits of an illegal arrest and as products of a *Miranda* violation. Vasiliavitchious says his August 4 statements were violative of his Sixth Amendment rights because he was interrogated after formal charges had been filed and an attorney appeared in court on his behalf.

*Fourth Amendment*

■ In this case there was probable cause to arrest. Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime. *U.S. v. Evans,* 27 F.3d 1219, 1228 (7th Cir. 1994). Law enforcement officials had information that stolen vehicles were being exported from the United States, originating from a storage facility in Rolling Meadows, Illinois. Vasiliavitchious was observed escorting two vehicles into the storage unit and later giving what appeared to be money and keys to a co-conspirator. Based on these observations, it was reasonable for the officers to believe that Vasiliavitchious was involved in exporting stolen vehicles.

Until 1980 the arrest warrant was the forgotten child of criminal procedure as practiced by police in the enforcement of law. I suspect the majority of warrants were issued for fugitives, for persons who had failed to appear in court and for those against whom indictments and information had been filed. This was so because a warrant was generally not required to make an arrest based on probable cause. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). What mattered was whether there was probable cause, it did not matter if there was a warrant. Arrest warrants, in sum, were a part of the process which occurred after formal charges were filed. Police rarely secured pre-charge arrest warrants, all this in decided contrast to search warrant practice.

■ This forgotten child, the arrest warrant, was remembered in 1980 by the United States Supreme Court which found a limited use for it in *Payton v. New York.* The Supreme Court held that absent exigent circumstances, a warrant is required to make an arrest in a suspect's home for a routine felony. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Vasiliavitchious argues that even though he was arrested in his apartment building parking lot, a public place, the police were still required to obtain a warrant for his arrest because they used a ruse to get him to leave his apartment and thereby violated the rule in *Payton.* Vasiliavitchious claims the arrest is illegal because he did not leave his apartment voluntarily, but was coerced by the officers' deception.

■ Vasiliavitchious misconstrues the purpose and policy behind the *Payton* rule. The chief of evils against which the Fourth Amendment is directed was the unauthorized physical entry of the home. *Payton,* 445 U.S. at 585, 100 S.Ct. at 1379. The purpose of requiring officers to obtain a warrant before entering a suspect's home to effectuate an arrest is to protect the "privacy and the

sanctity of the home." *Id.* at 588, 100 S.Ct. at 1381. The Fourth Amendment has thus drawn a firm line at the entrance to a person's home. *Id.* at 590, 100 S.Ct. at 1382.

The issue here is not whether the officers circumvented the warrant requirement by drawing the defendant out of his home, but whether this circumstance against which the Fourth Amendment guards was violated. *Payton* states that an officer may not cross the threshold of the home to make an arrest without a warrant. The officer never entered Vasiliavitchious' home. He knocked at the door, identified himself as a police officer and waited outside the apartment for Vasiliavitchious to come outside. The privacy and sanctity of the home were thus respected by using the ruse. The ruse, in fact, preserved rather than damaged the sanctity of the home. There is no *Payton* violation.

■ Vasiliavitchious argues the ruse is improper because he did not voluntarily consent to leaving his home and the wanton use of misrepresentations by police officers should not be sanctioned. The officers' tactics can only be found to violate the Fourth Amendment if the ruse was improper in and of itself. However, *on its own*, a police ruse cannot be considered bad. Neither precedent nor policy support condemnations of the ruse in this case.

First, the courts have found no constitutional violation when police officers use tactics of misinformation to solve crimes. Most prominent is the Supreme Court's 1969 decision in *Frazier v. Cupp* in which Justice Marshall held that an officer's lie to the defendant that his co-conspirator had confessed was insufficient to make an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). The ruse at issue in *Frazier* was substantially more serious in its scope and its consequence than the ruse here. The defendant in *Frazier* was tricked into making a full confession. In this case, the officer's use of trickery only obtained Vasiliavitchious' arrest, an inevitable consequence since the officers had probable cause. Unsurprisingly the courts have upheld the use of subterfuge to trick a defendant into leaving his home on many occasions under circumstances very similar to the ones here. *People v. Witherspoon*, 216 Ill.App.3d 323, 332, 576 N.E.2d 1030, 1036, 160 Ill.Dec. 76, 82 (1st Dist.1991) ("The use of deception to lure a defendant from his home in order to effectuate an arrest without a warrant has been held not to violate fundamental fairness.") *People v. Moore*, 105 Ill.App.3d 264, 268, 434 N.E.2d 300, 303, 61 Ill.Dec. 147, 150 (1st Dist.1981) (officer's use of deceptive tactics to lure defendant out of his home to make an arrest did not violate fundamental fairness nor illegally circumvent the *Payton* rule); *People v. Houston*, 36 Ill.App.3d 695, 699, 344 N.E.2d 641, 644–45 (1st Dist.1976), *cert. denied, Gibson v. Illinois*, 429 U.S. 1109, 97 S.Ct. 1143, 51 L.Ed.2d 562 (1977) (officer's use of subtle subterfuge, merely disguising the nature of the crime he was investigating, was not so offensive to the Constitution to require proscription); *People v. Trudell*, 173 Cal.App.3d 1221, 1229, 219 Cal.Rptr. 679, 683 (1st Dist.1985) (consensual decision to leave residence is not a prerequisite to a valid arrest if the arrest is based on probable cause and does not require an invasion of a residence).

Second, the use of subterfuge in and of itself does not offend the conscience. If the officer had a warrant and thus had the right to enter the home, yet still resorted to a ruse to get Vasiliavitchious out of his home, no motion would have been seriously pursued here. It is unlikely that any defendant, knowing an officer had every right to enter his home to make the arrest, would assert that his rights were violated because a ruse was used to secure the inevitable result of his arrest. It is inconceivable that a court would accept the assertion.

■ Here, a warrant was not necessary because Vasiliavitchious was standing in the open doorway of his apartment when the officers used the ruse to get him to go out to the parking lot. A person standing in an open doorway of his home is deemed to be in a public place for purposes of the Fourth Amendment and a warrant is not necessary to make the arrest. *United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976).

Third, were it necessary to decide whether the ruse is reasonable in itself and under the circumstances here, I would hold that it was. Why did the officers resort to a ruse when it was legally unnecessary? The officers testified that the ruse was used for safety considerations. There is no reason to doubt the officers' testimony since they had no need to use the ruse, Vasiliavitchious could have been arrested in his doorway, or with a little work, the officers could have obtained a warrant. In fact, by not getting a warrant, the officers surrendered something of value to them. They gave up access to the apartment and the benefits of plain view and possibly a limited search which might have turned up incriminating evidence. The officers also took the chance that evidence might have been destroyed by others before they were able to return with a warrant.

The use of subterfuge may be reasonable policy in many situations. By removing an arrestee from his home where others might be present, danger to the arresting officers and the arrestee is reduced. So too is the trauma to family members and friends who may be present in the home to witness the arrest.

■ Finally, if I were to find the arrest invalid, Vasiliavitchious' statements would not be suppressed. The Supreme Court has held that, "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*" *New York v. Harris,* 495 U.S. 14, 21, 110 S.Ct. 1640, 1644–45, 109 L.Ed.2d 13 (1990). Since the only thing the prosecution intends to use are the post-arrest statements, the Fourth Amendment claim has no merit.

There is no Fourth Amendment violation.

### *Fifth Amendment*

■ Vasiliavitchious next claims his Fifth Amendment rights were violated because he did not understand the English language fully enough to make a knowing and intelligent waiver of his rights. He fur-ther claims the statements he made lack reliability because he could not understand what was said to him nor could he accurately communicate his thoughts in English in response to the questioning. Law enforcement officers are free to question a suspect if he knowingly and intelligently waives his rights after receiving the *Miranda* warnings. *Davis v. United States,* —— U.S. ——, ——, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994). The validity of a waiver of *Miranda* rights is determined on the basis of the totality of the circumstances. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986). The prosecution carries the burden of demonstrating a proper waiver of *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

The government has met its burden and has presented sufficient evidence to prove that Vasiliavitchious understood English well enough to understand the substance and meaning of the *Miranda* warnings when given to him on November 19, 1994 and August 4, 1995 and well enough to communicate his thoughts in English on both dates. Officers who were present when Vasiliavitchious was arrested on both occasions and who stopped Vasiliavitchious for a routine traffic offense offered credible and persuasive testimony of Vasiliavitchious' ability to communicate in English. The officers testified that Vasiliavitchious responded to questioning and engaged in conversation in English without any indication that he had trouble with the English language. The officers also testified that Vasiliavitchious expressed to them that he understood his rights prior to answering any questions. Vasiliavitchious only offered the testimony of his fiance, which this Court did not find credible, who stated that Vasiliavitchious has limited English proficiency and that she did not believe he could understand the *Miranda* warnings.

Furthermore, the investigative reports, which document Vasiliavitchious' responses to questioning, clearly indicate he is an individual who has adequate proficiency with the English language. On November 9, 1994, after viewing the surveillance tape, the interrogating officer expressed to Vasiliavitchious

that he did not believe he was telling the truth. In response, Vasiliavitchious stated "Your tape shows me loaning money to a friend. You've got nothing." On August 4, 1995, while in transit to the MCC Vasiliavitchious and the arresting officer discussed Vasiliavitchious' car that was seized, the possibility of the police listening to his phone calls and the subject of boxing. These statements are strong evidence of Vasiliavitchious' ability to understand and speak English and to cope with police questioning.

Considering the fact that the *Miranda* warnings are not complex or difficult to understand and given Vasiliavitchious' proficiency with the English language, this Court is confident that Vasiliavitchious understood his rights when read to him and that he could accurately communicate his thoughts in English. As such, I find Vasiliavitchious intelligently and knowingly waived his *Miranda* rights when he acknowledged that he understood his rights when read to him and chose to respond to police questioning.

There is no Fifth Amendment violation.

#### Sixth Amendment

The defendant also claims that he was denied his Sixth Amendment right to counsel when he was interrogated on August 4, 1995 after formal charges had been filed and an attorney had appeared in court on his behalf. Vasiliavitchious was represented by counsel when he was first charged in 1994, but that charge was later dropped. We do not reach the issue of whether a defendant's invocation of his right to an attorney on a charge that has been dropped carries over when he is reindicted, but assume for purposes of the motion to suppress that Vasiliavitchious did invoke his Sixth Amendment right to an attorney.

■ When a defendant indicates that he wants the assistance of counsel, the authorities must cease their interview and further questioning is forbidden. *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). *See also Patterson v. Illinois*, 487 U.S. 285, 291, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988). However, the Sixth Amendment is not violated whenever the State obtains incriminating statements from the accused after the right to counsel has attached. *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). Once the Sixth Amendment has attached and a defendant has expressed a desire to deal with the police only through counsel, the authorities may not interrogate him without counsel present unless the defendant himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). The issue here is whether Vasiliavitchious was interrogated or whether he initiated communication with the police.

■ The government asserts that Vasiliavitchious was not interrogated by the police, but rather claims that Vasiliavitchious initiated the conversation with Agent Davies. Vasiliavitchious was taken to the Des Plaines Police Department after his arrest. During this drive the officer initiated a conversation with Vasiliavitchious. However, no incriminating statements were elicited. Vasiliavitchious remained at the police station approximately fifteen minutes before being transported to the U.S. Marshals Service. During this forty-five minute drive, Vasiliavitchious initiated conversations with Agent Davies about his car, the police's ability to listen to his phone calls and about his boxing career.

Vasiliavitchious was then turned over to the U.S. Marshals Service for processing prior to his arraignment. Seven hours later, after his arraignment hearing he was transported to the MCC. It is during this transport to the MCC that Vasiliavitchious made statements to Agent Davies that he now seeks to suppress. There is no doubt from the record of the conversation that Vasiliavitchious initiated the communication. The investigation report documented the conversation as follows:

Subject: I know that you need to get handwriting from my wife, you are only doing your job.

Writer: I served the Subpoena on her for handwriting exemplars and I need to have her come to my office [to] do them.

Subject: Please do not do anything with my wife, my wife knows nothing of this business.

Subject: Maybe I should go away for a while.

The Supreme Court has held there is no Sixth Amendment violation when an accused initiates a conversation by asking officers questions that evinces a willingness and desire for a generalized discussion about the investigation. *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983). There can be no doubt that Vasiliavitchious initiated the conversation "in the ordinary dictionary sense of that word." *Id.* at 1045, 103 S.Ct. at 2835.

Even if the earlier conversation en route to the Des Plaines Police Department is considered to be an interrogation, it cannot be said that Vasiliavitchious' statements en route to the MCC were the product of the earlier interrogation. The conversations were separated by both time and place. *Andersen v. Thieret,* 903 F.2d 526, 532 (7th Cir.1990) (lapse of time between initial questioning and volunteered statements removes any possibility that defendant was responding to police interrogation). Not only was there a considerable lapse of time between the conversations, more than seven hours, but there were many changes of location between the conversations. The lapse in time and place suffices to separate the initial interrogation from the subsequent conversation and to satisfy this Court that Vasiliavitchious initiated his own statements and the conversation was not the product of the earlier police interrogation.

There is no Sixth Amendment violation.

### Conclusion

The motion to suppress and quash the arrest is denied.