**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 97-4178

STURDY HARRISON,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Herbert N. Maletz, Senior Judge, sitting by designation.
(CR-96-163-PJM)

Argued: October 29, 1998

Decided: January 25, 1999

Before MICHAEL and MOTZ, Circuit Judges, and STAMP,
Chief United States District Judge for the Northern District of
West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Beth Mina Farber, Chief Assistant Federal Public
Defender, Baltimore, Maryland, for Appellant. Jan Paul Miller, Assis-
tant United States Attorney, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** James K. Bredar, Federal Public Defender, Baltimore, Mary-
land, for Appellant. Lynne A. Battaglia, United States Attorney,
Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Sturdy Harrison of knowingly returning to this country without permission from the Attorney General after having been deported, in violation of 8 U.S.C.A. § 1326 (West Supp. 1998). The evidence used to convict Harrison included statements he made to INS officers before they arrested him and a set of fingerprints taken after this arrest. Harrison argues on appeal that admission of this evidence constituted error and violated his constitutional rights. For the reasons discussed below, we affirm.

I.

Sometime prior to March 1996, Harrison co-signed a bail bond to secure the release of his brother. Although at all relevant times Harrison resided in Washington, D.C., a bail bond company in Prince George's County, Maryland affiliated with Charles Louis issued this bond. Louis and his associates had several dealings with Harrison in attempts to locate Harrison's brother. Harrison testified that during these encounters the bail bondsmen (whom he refers to as bounty hunters) treated him roughly, and that he was afraid of them. He also testified that the bondsmen told him that they would not report him to immigration authorities if he divulged his brother's location. Harrison refused to tell the bondsmen where his brother was located.

On March 13-15, 1996 Louis contacted the INS office in Baltimore and notified the INS that he was aware of a Mr. Sturdy Harrison whom he believed had illegally returned to this country after deportation. An INS report of communications with Louis indicated that Harrison had "not cooperated" with the bail bondsmen in searching for his brother. INS Baltimore ran several checks and determined that a Sturdy Harrison from Jamaica had been deported and that his presence in this country would violate the law. The INS then arranged to

2

have Louis bring Harrison from his home to the bail bond company in Prince George's County, where the INS would arrest him. The INS was aware that Louis planned to do this under the guise of a meeting concerning Harrison's brother.

On March 19, 1996, Louis and two of his associates went to Harrison's home and brought him with them to the bail bond office. Pursuant to the plan, the INS arrested Harrison in the parking lot of the bail bond company. At that time, but prior to the actual arrest, INS agents asked the defendant if his name was Sturdy Harrison; he responded "yes". The INS also asked Harrison where he was from; he responded "Jamaica". Following his arrest and Miranda warnings, while at the INS office, Harrison was fingerprinted. It is these statements and fingerprints that serve as the basis for Harrison's principal claims on appeal.

Harrison argues that he was arrested before he arrived at the parking lot where INS agents formally charged him. He asserts that Louis and the other bondsmen, acting as agents for the INS, had earlier forcibly arrested him in his home. Harrison further contends that the warrantless arrest by the bondsmen violated his Fourth Amendment rights and that the district court should have suppressed all evidence obtained as a result of this unconstitutional arrest.

II.

The role of the bondsmen and their connection, if any, to the INS presents the threshold issue in this case. Harrison contends that his original seizure by the bail bondsmen constituted an unconstitutional arrest because he was taken from his home against his will, without a warrant, by government agents. Harrison further argues that the fruits of this arrest by the bondsmen should have been excluded from evidence. See Wong Sun v. United States, 371 U.S. 471, 484 (1963). In order to prevail on this claim, Harrison must show that the bail bondsmen who took him from his home were in fact acting as agents of the INS, not as private citizens. See United States v. Jacobsen, 466 U.S. 109, 113 (1984) (noting that purely private search does not implicate the Fourth Amendment); United States v. Kinney, 953 F.2d 863, 865 (4th Cir. 1992) (holding that private citizen's action triggers

3

constitutional protections only if citizen is acting as instrument or agent of government).

In determining whether a private citizen has acted as an instrument or agent of the Government a court must consider: (1) whether the Government "knew of and acquiesced in" the private activity and (2) whether the citizen was motivated on the basis of assisting the government -- as opposed to on the basis of private gain. See United States v. Feffer, 831 F.2d 734, 739 (7th Cir. 1987). If both factors are present, a private party will be considered to have acted as a government agent. In this case, the parties agree that the bondsmen were motivated purely out of a desire to aid the INS. Thus only the first factor is at issue, i.e. whether the Government knew of and acquiesced in the activities of the bondsmen. This is a factual question, which we review for clear error. Ornelas v. United States, 517 U.S. 690, 699 (1996).

In support of its argument that it did not dictate, and indeed was not even aware of, the tactics used by the bondsmen to retrieve Harrison from his home, the Government offered the testimony of INS Agent Mangiulli. Mangiulli testified that the first contact concerning Harrison came from Louis and was not initiated by the Government. He explained that the INS performed a thorough check on the matter before deciding to proceed; after the check revealed that a Sturdy Harrison from Jamaica had been deported, the INS contacted Louis and set up a time and place to meet Harrison and Louis. Mangiulli further testified that he was unaware that the bondsmen planned to use force or to take Harrison against his will.

To counter this version of the facts, Harrison points out that (1) the INS arranged the meeting between Louis, Harrison, and the INS and (2) the INS had been warned that Harrison had previous encounters with the bondsmen and that, in these instances, Harrison had not been cooperative. From these two facts, Harrison deduces that the INS, by requesting that the bondsmen bring him to the bail bond office knowing that he would resist efforts to accompany the bondsmen, encouraged and endorsed the bondsmen's actions.

The problem with this argument is that Agent Mangiulli testified that, although he had read an INS report outlining Harrison's prior

4

resistance, he was not aware that the bondsmen would use strongarm tactics in picking up Harrison. Mangiulli testified that he believed the bondsmen would bring Harrison to them without incident under the guise of a meeting about his brother's bond.

The fact that the Government knew of and acquiesced in the ruse utilized to bring Harrison to the parking lot is not enough to show that it knew of and acquiesced in the allegedly unconstitutional forcible arrest by the bondsmen. See United States v. Rhodes, 713 F.2d 463, 467 (9th Cir. 1983) (concluding that there was insufficient evidence to prove that bounty hunter acted as a government agent when he set up a meeting between defendant and undercover officer that led to arrest); Alvarez v. Montgomery County, 963 F. Supp. 495, 498-99 (D. Md. 1997) (concluding that officers' use of misrepresentation in order to draw defendant from home and effectuate a warrantless arrest was proper), aff'd, 147 F.3d 354 (4th Cir. 1998); United States v. Vasiliavitchious, 919 F. Supp. 1113, 1115-18 (N.D. Ill. 1996) (same); cf. United States v. Carter, 884 F.2d 368, 374-75 (8th Cir. 1989) (holding that deceptive statements used by law enforcement agents in order to obtain consent to search defendant's wallet were relevant but alone not enough to invalidate consent).

In sum, the record contains ample evidence to support the district court's finding that the bondsmen did not act as government agents. As private citizens, their activity could not trigger constitutional protections. Thus statements Harrison made to INS agents prior to his arrest by those agents do not constitute the fruit of an unconstitutional arrest. The district court did not err in refusing to suppress them.

III.

Harrison's fingerprints similarly can not be considered the fruit of an unconstitutional arrest by the bondsmen. However, because the fingerprints were taken after the INS arrested Harrison, we must also consider the validity of that arrest.

The district court found that the INS had probable cause to arrest Harrison and so its arrest of him violated no constitutional provision; Harrison does not challenge this finding on appeal. The court, however, also concluded that the arrest was illegal because, although the

5

agents had ample time to do so, they failed to obtain a warrant. Thus, the court found, their arrest of Harrison violated 8 U.S.C.A. § 1357(a)(2) (West Supp. 1998), which authorizes warrantless arrests by the INS only if the agents have a reasonable belief that an alien is illegally in the country and that it is likely the alien will escape "before a warrant can be obtained." Id.

The Government initially argues that the arrest was not illegal, that it did not violate § 1357(a)(2). Alternatively, the Government asserts that, even if the search did violate the statute, the fingerprints need not be excluded. We review the district court's legal conclusions de novo. See United States v. Elie, 111 F.3d 1135, 1140 (4th Cir. 1997), and its underlying factual findings for clear error. See Ornelas, 517 U.S. at 699.

A.

In support of its claim that the INS arrest of Harrison did not violate § 1357(a)(2), the Government cites Contreras v. United States, 672 F.2d 307 (2d Cir. 1982). The Government overstates the holding of this case. In Contreras, the court explained "when the alien's deportability is clear and undisputed, that circumstance alone may provide a sufficient basis for an INS officer to believe that escape is likely before a warrant can be obtained." Id . at 309 (emphasis added). This does not amount to a holding that in every case in which an alien is deportable an arrest can be made without a warrant. That interpretation is contrary to the statute itself, which requires that the INS must have reasonable belief both that the alien is in the country illegally and that the alien is likely to escape before a warrant can be obtained. See 8 U.S.C.A. § 1357(a)(2).

Hence, the critical question remains did the INS believe Harrison was likely to flee before a warrant could be obtained. In making such a determination, a court examines the objective facts within the knowledge of the INS Agents. See Contreras, 672 F.2d at 309. The district court found that the agents in this case had sufficient time within which to procure a warrant and that the objective risk of flight from Harrison was minimal. The record evidence outlined above offers ample support for this finding.

6

Nor is <u>United States v. Cantu</u>, 519 F.2d 494 (7th Cir. 1975), upon with the Government also relies, to the contrary. In that case the agents could not determine where the defendant, who was traveling by car, would be when they caught up with her and for this reason escape was held likely before a site-specific warrant could be obtained. <u>Id.</u> at 497-98. In our case, there is no evidence that Harrison was traveling. To the contrary, the bondsmen had been to his house several times and found him there each time. Furthermore, the court in <u>Cantu</u> rejected the INS's argument that it did not have probable cause to arrest the defendant until the agents observed her personally because the tip that led them to her had been independently corroborated. <u>Id.</u> at 497. Similarly, here the INS verified the bail bondsman's tip as to Harrison's illegal presence in the country through independent evidence from their database well prior to Harrison's arrest by the INS. For these reasons, the district court did not err in concluding that failure to obtain a warrant in these circumstances violated 8 U.S.C.A. § 1357(a)(2).

B.

The question then becomes what effect, if any, this statutory violation has on the admissibility of the fingerprint evidence obtained from that arrest. The Government maintains that, even if the arrest violated the statute, the district court properly admitted the fingerprint evidence because the exclusionary rule is constitutionally based and is not triggered by the violation of a mere statute.

Whether the exclusionary rule generally applies when the Government violates a statute rather than the constitution presents a difficult question, and one which we need not reach today. Even if the exclusionary rule applies to evidence obtained after an arrest that is illegal but not unconstitutional, the district court's admission of Harrison's fingerprints was nonetheless proper because the exclusionary rule does not apply to fingerprint evidence obtained in the circumstances presented here. <u>See United States v. Dionisio</u>, 410 U.S. 1 (1972).

In <u>Dionisio</u>, the Court held that governmental officials can constitutionally obtain a "compelled display of identifiable physical characteristics" (in that case a voice exemplar), even without making any "preliminary showing of reasonableness." <u>Id.</u> at 5, 8. In doing so, the

7

Court distinguished Davis v. Mississippi, 394 U.S. 721 (1969), upon which Harrison principally relies. In Davis, the Supreme Court had refused to adopt an exception to the exclusionary rule for evidence that is inherently reliable, such as fingerprints, and held that fingerprints obtained as the result of an unconstitutional seizure must be suppressed. Id. at 724-25. The Dionisio Court explained that "Davis is clearly inapposite to a case where the initial restraint does not itself infringe the Fourth Amendment." 410 U.S. at 11. Because the INS indisputably had probable cause to arrest Harrison, the Fourth Amendment was not violated by that arrest, and so, Dionisio teaches, the fingerprint evidence need not be suppressed. See id.; see also United States v. Crews, 445 U.S. 463, 464 (1980) ("[r]espondent himself is not a suppressible fruit"); United States v. Arias, 678 F.2d 1202, 1206 (4th Cir. 1982) ("the identity of[the] defendant[] is not suppressible under the exclusionary rule").

IV.

Finally, Harrison contends that the district court erred in admitting a certain certificate from the INS. As an element of the offense charged, the Government was required to prove that Harrison was in this country without having requested and received permission from the Attorney General. See 8 U.S.C.A. §1326(a).

As proof that a thorough search had been performed, Agent Mangiulli testified that no request notification was found in Harrison's file as would be standard if such a request had been made. Also, the Government admitted a Certificate of Nonexistence of Record. Harrison argues that, because the writing on the seal affixed to this certificate was illegible, the document did not "bear a seal" under Federal Rule of Evidence 902(1) and so was not self-authenticating. Therefore, Harrison maintains, its admission was improper. The district court determined that the document contained a seal "purporting to be" that of the United States or a political subdivision thereof, as required by Rule 902(1). The court noted that the seal contained an eagle in the middle and that it was adequate. The court did not abuse its discretion in so ruling.

V.

In sum, we hold that the bail bondsmen who brought Harrison to the site where he was arrested by the INS did so as private citizens.

8

Thus their actions, however egregious, did not violate Harrison's constitutional rights. Evidence obtained as a result of their actions, specifically Harrison's statements to INS agents prior to his arrest by those agents, was not subject to the exclusionary rule. We further hold that, although the INS's arrest of Harrison violated 8 U.S.C.A. § 1357(a)(2), the fingerprints obtained as a result of that arrest were nonetheless properly admitted. Finally, we find no abuse of discretion in the district court's admission of a document under Federal Rule of Evidence 902(1) despite the lack of clarity of the lettering on its seal. For these reasons, the judgment of the district court is

AFFIRMED.