■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL T. HINES, Appellant. [780 NYS2d 419]—

Lahtinen, J. Appeal from a judgment of the County Court of Chemung County (Buckley, J.), rendered March 3, 2003, upon a verdict convicting defendant of the crimes of rape in the first degree, burglary in the second degree, sexual abuse in the first degree, assault in the second degree and assault in the third degree.

The victim met defendant in late 2000 or early 2001 while she worked at a grocery store in Chemung County and, thereafter, they often spent time together. However, on December 4 and 6, 2001, incidents allegedly occurred between defendant and the victim that led to defendant being indicted for the crimes of burglary in the second degree (two counts), rape in the first degree, sexual abuse in the first degree, assault in the second degree and assault in the third degree. Defendant and the victim, both of whom testified at trial, related varying versions regarding the relevant events.

The victim stated that the relationship had never involved sexual intimacy and that, on December 4, 2001, when she rebuffed defendant's sexual advances, he became angry and choked her, leaving bruises on her neck and arms. While defendant acknowledged choking the victim on December 4, he related that they had been involved sexually since shortly after meeting and that his actions occurred when the victim had made threats against his wife and children. The victim sought medical attention and she spoke to officers in the Elmira City Police Department regarding the incident. Defendant was contacted by police by phone on December 4 and 5, 2001 and returned the phone calls, agreeing to voluntarily go to the police station to discuss the incident. He gave a statement on December 5 in which he contended that he "snapped" because of the victim's threats against his children. He was not detained following his interview with police.

According to the victim, she awoke on the morning of December 6, 2001 to find defendant in her bedroom holding a novelty baseball bat. He struck her twice on the head with the bat before she could cover her head with a pillow, and he continued striking her through the pillow. Defendant expressed anger because the victim had reported the December 4 incident

to police. He produced a handgun and ordered her to remove her underwear. Defendant, who was wearing a condom, then forcibly engaged in intercourse with her. He escorted her downstairs so he could check a calendar to determine whether her school-aged brother would be home soon. Once downstairs, defendant began rubbing his penis against the victim's legs until he ejaculated, this time without a condom. Defendant attempted to wipe all the semen off the victim's legs. He threatened her with harm if she told anyone about the incident and then exited the premises. With respect to the events of December 6, defendant denied any involvement and maintained his innocence. The victim contacted police on December 6, an investigation was commenced and she was transported to a hospital, where a rape kit was administered. Semen found on her thigh was eventually linked, through DNA testing, to defendant.

On the evening of December 6, 2001, defendant called the police station seeking to speak with the officer who had interviewed him regarding the December 4 incident. He stated on the phone that he was being falsely accused of rape and also inquired whether there was a warrant for his arrest. The officer who took the call told him he would check to see if there was a warrant. Upon speaking with other officers, it was decided that defendant would be told there was an arrest warrant, even though one had not yet been issued. Defendant called back a short time later and the officer told him there was a warrant for his arrest. Defendant responded that he would walk to the police station, which he then did. Upon arriving at the station, defendant was read his *Miranda* rights. He then spoke with investigators and maintained his innocence regarding any events of December 6. He was, however, arrested later that evening.

Following a jury trial, defendant was convicted of the December 4, 2001 third degree assault (count six of the indictment) and of the December 6, 2001 second degree burglary, first degree rape, first degree sexual abuse and second degree assault (counts two through five of the indictment). He was sentenced to various concurrent determinate sentences of imprisonment, the longest of which was 17½ years for first degree rape. Defendant appeals.*

Defendant first argues that, because the police incorrectly informed him that an arrest warrant had been issued, he was unlawfully induced to leave his home in violation of federal and

---

* Defendant is not contesting on appeal his conviction for assault in the third degree, which arose from the events of December 4, 2001.

state protections against unreasonable searches and seizures (*see* US Const 4th Amend; NY Const, art I, § 12) and, thus, his subsequent statements to police should have been suppressed. While a nonconsensual entry into a suspect's home to make a warrantless arrest is unlawful unless supported by exigent circumstances (*see Payton v New York,* 445 US 573, 576 [1980]; *People v Jones,* 2 NY3d 235, 239 [2004]), where, as here, "[t]he arrest [is] made outside the defendant's home, no *Payton* issue is presented" (*People v Roe,* 73 NY2d 1004, 1006 [1989]; *see People v Reynoso,* 2 NY3d 820 [2004]). As a general rule, police subterfuge in solving a crime does not violate the constitution (*see Frazier v Cupp,* 394 US 731 [1969]; *Lewis v United States,* 385 US 206, 209 [1966]) and, specifically, using misinformation or a ruse to get a suspect to leave his or her home does not run afoul of constitutional protections unless rising to the level of coercive conduct (*see People v Roe,* 136 AD2d 140, 143 [1988], *affd* 73 NY2d 1004 [1989]; *see also People v Williams,* 222 AD2d 721, 721 [1995], *lv denied* 87 NY2d 978 [1996]; *People v Damiano,* 209 AD2d 873, 873-874 [1994], *affd* 87 NY2d 477 [1996]; *People v Rosario,* 186 AD2d 598, 598 [1992], *lv denied* 81 NY2d 794 [1993]; *cf. United States v Vasiliavitchious,* 919 F Supp 1113, 1117 [1996]).

While the use of misinformation about an arrest warrant certainly could—and, indeed, in most situations, would—support a finding of impermissible coercive conduct, the unusual circumstances of this case do not lead to such a conclusion. Defendant had voluntarily gone to the police station the prior day and talked to an officer. On December 6, 2001, defendant was the one who made the call to police and he initiated the discussion about an arrest warrant. Defendant also stated to the officer who answered the call that he was being accused of raping someone, threats had been made against him and his family, and he wanted a protective order. He was thus aware of the serious accusations being made against him and he was seeking police involvement in the matter. When the officer indicated that he did not know if there was a warrant and that he would check, it was defendant who later made the follow-up call seeking such information. The officer, after wrongly informing him that an arrest warrant had been issued, asked defendant on the phone whether he wanted the police to pick him up and defendant declined the offer, stating that he would walk to the station. While by that time police had defendant's home under surveillance, significantly, they neither entered nor arrested him in his home (*see Payton v New York, supra* at 588-589; *compare Bumper v North Carolina,* 391 US 543 [1968]; *People v Harris,* 77 NY2d 434, 437 [1991]). Indeed, they did not even ar-

rest him as he exited his home. Instead, he walked to the station where, after being apprised of his *Miranda* rights, he explained his version of the germane events and, upon giving unsatisfactory answers to some police questions, he was eventually arrested later that evening. Based upon these facts, we are unpersuaded that defendant left his home because of coercive conduct by police.

Defendant next contends that the verdict was not supported by legally sufficient evidence and was against the weight of the evidence. A verdict is legally sufficient if, viewing the evidence in the light most favorable to the People, a rational jury could reasonably find the defendant guilty (*see People v Calabria,* 3 NY3d 80, 81 [2004]; *People v Rayam,* 94 NY2d 557, 560 [2000]; *People v Contes,* 60 NY2d 620, 621 [1983]). Here, the testimony of the victim, medical personnel and police, together with the DNA evidence, provided ample evidence to find legal sufficiency. With regard to defendant's contention that the victim's injuries did not constitute a "physical injury" within the meaning of Penal Law § 120.05 (*see* Penal Law § 10.00 [9]), sufficient evidence was provided by the medical testimony of pain at specific points on the victim's head upon palpation, a diagnosis of a mild concussion, the victim's testimony of severe pain, and her reporting of residual problems for which she sought further treatment and medicine, including recurring severe headaches (*see People v Guidice,* 83 NY2d 630, 636 [1994]; *People v Bernier,* 279 AD2d 701, 702 [2001], *lv denied* 96 NY2d 797 [2001]; *Matter of Manuel G.,* 215 AD2d 558, 558 [1995]).

When reviewing a challenge to the weight of the evidence, we act analogous to a thirteenth juror (*see People v Cahill,* 2 NY3d 14, 58 [2003]) and consider from a neutral standpoint, giving deference to the jury's credibility determinations, " 'the relative probative force of conflicting testimony and the relative strength of conflicting inferences' " (*People v Bleakley,* 69 NY2d 490, 495 [1987], quoting *People ex rel. MacCracken v Miller,* 291 NY 55, 62 [1943]). At trial, defendant denied involvement with the victim on December 6, 2001, and he contended that his semen was found because he had consensual sex with the victim on December 4, 2001. Credibility was clearly a key issue and, upon review of the record, we find no reason to reject the jury's decision to credit the victim's testimony.

Finally, we find neither an abuse of discretion in the sentence imposed nor the presence of extraordinary circumstances justifying a modification of the sentence (*see People v Perkins,* 5 AD3d 801, 804 [2004]; *People v Washington,* 4 AD3d 546, 548-549 [2004]).

Mercure, J.P., Crew III, Mugglin and Rose, JJ., concur. Ordered that the judgment is affirmed.