2007 OK CR 10

**Robert D. BRUMFIELD, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2005–952.**

Court of Criminal Appeals of Oklahoma.

March 20, 2007.

Kyle McCallum, Attorney at Law, Hugo, OK, attorney for defendant at trial.

James R. Wolfe, Assistant District Attorney, Pushmataha District Attorney, Antlers, OK, attorney for the state at trial.

Kimberly J. Tabor, Hurst, TX, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer L. Strickland, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Presiding Judge.

¶ 1 Robert D. Brumfield was tried by jury and convicted of Aggravated Manufacture of a Controlled Dangerous Substance (Methamphetamine), under 63 O.S.Supp.2004, § 2–401(G)(3)(h) (Count I), and Unlawful Possession of a Controlled Dangerous Substance (Methamphetamine), under 63 O.S.Supp. 2004, § 2–402(B)(1) (Count II), in the District Court of Pushmataha County, Case No. CF–2005–35. In accordance with the jury's recommendation, the Honorable Lowell Burgess, Jr., sentenced Brumfield to imprisonment for twenty (20) years on Count I, and imprisonment for two (2) years on Count II,

to be served concurrently. The trial court also imposed a $50,000 fine on Count I, as required by 63 O.S.Supp.2004, § 2–401(G)(3)(h).[1] Brumfield appeals his convictions and his sentences.

¶ 2 During the evening of March 16, 2005, Tiffany Hyde was present in the residence of Johnny Payne when officers from the Antlers Police Department executed a search warrant for the home and discovered a methamphetamine lab. In order to avoid being arrested or charged, Hyde agreed to go to the home of Robert Brumfield to see if there was methamphetamine present or if he was "cooking" methamphetamine. Hyde had previously been a live-in girlfriend of Brumfield's and although she had recently moved out, she still had a key. Hyde went to Brumfield's home, and while there she, Brumfield, and his new girlfriend, Tara Kinsey, each did a line of methamphetamine off of a "Jesus mirror" that they typically used for this purpose.[2]

¶ 3 After leaving the Brumfield home, Hyde met up with Officer Ben Milner and told him about using the methamphetamine with Brumfield and that he had gotten the drug out of a green zippered bag, which contained several small plastic bags of methamphetamine. Hyde also informed Milner that she had previously lived with Brumfield and that he typically cooked methamphetamine in his home about three times per week. Hyde also informed Milner that the last time she had witnessed Brumfield cooking was about 10 days earlier. Milner then used this information to obtain a warrant to search Brumfield's home.[3]

¶ 4 At approximately 9:30 a.m., on March 17, 2005, Officer Milner and three other officers from the Antlers Police Department (Keith Mack, B.J. Hedgecock, and Johnny Mitchell) arrived at the Brumfield home to execute the warrant. Milner testified that he knocked on the door, identified the group as "police," and announced that they had a warrant to search the property. After waiting approximately 20 seconds with no response, Milner instructed Deputy Mack to "take the door." Mack then busted open the front door with a sledge hammer, and Officers Milner, Mack, and Mitchell went into the Brumfield home. They observed Brumfield and a woman who was not wearing pants coming toward the front door from the back bedroom area. The officers also noticed a strong, irritating chemical smell, which they associated with the clandestine manufacture of methamphetamine.

¶ 5 During the subsequent search of Brumfield's home, they discovered a large glass jar containing a two-layer liquid solution, which tested positive for methamphetamine, in the leg of a pair of jeans that were in the washing machine.[4] The officers also discovered a sealed plastic bag containing numerous striker plates that had been removed from paper matchbooks. The bag of striker plates was found in a bag of dog food, and the ember remains of the matchbooks were found in the fireplace. In addition to these items, the officers discovered the following in Brumfield's home, all of which are associated with the production of methamphetamine: a bottle of Liquid Fire, a container of Red Devil

---

1. Brumfield was also ordered to pay a $5,000 assessment for enforcement of CDS, a $100 assessment for trauma care assistance, and a $100 assessment for the drug abuse education and treatment revolving fund, all in compliance with the requirements of 63 O.S.Supp.2004, § 2–401, in addition to other fees and assessments. None of these assessments is challenged on appeal.

2. Although a square mirror with the image of Christ on it was subsequently discovered during the search of Brumfield's home, no methamphetamine residue could be detected on it. Hyde testified at trial that the mirror was usually cleaned after being used to ingest meth.

3. The warrant was signed by Judge Lowell Burgess, Jr., at 8:43 a.m., on March 17, 2005.

4. O.S.B.I. chemist Marty Wilson testified that the net weight of the two-layer liquid (not including the container) was 1,141 grams. He noted that the top layer, the aqueous layer, contained "P2P," a Schedule III substance that is a by-product of methamphetamine production through the red phosphorus/iodine method, and that the bottom layer, the oil or organic layer, contained methamphetamine, a Schedule II substance. Wilson testified that his testing was purely qualitative. He did not attempt to quantify the amount of P2P or methamphetamine in either of the two layers; nor did he attempt to determine the weight of the separate layers.

lye, multiple packages of coffee filters, two large containers of table salt, a container of phosphoric acid, three bottles of rubbing alcohol, baggies, scales, chemistry books, and various empty glass jars.

¶6 A further search of the property around the residence revealed a large container of iodine (placed in the wheel well area of a decaying car), a bag of plastic vials (in a van on the property), and numerous items of laboratory-type glassware (in a shop area and buried under Brumfield's home). In the remains of a burn pile in the back yard, officers discovered what appeared to be toluene cans and blister packs (typically associated with ephedrine tablets).[5] The search, which lasted approximately two days, did not, however, reveal the green zippered bag described by Hyde or any usable methamphetamine.

¶7 The crux of Brumfield's Proposition I claim is that the manner in which the Antlers police officers executed the warrant to search his home violated the Fourth Amendment's "knock-and-announce" requirement and also 22 O.S.2001, § 1228. Defense counsel filed a motion to suppress based upon this claim, which was denied by the Honorable Gary L. Brock, on May 11, 2005, at the conclusion of Brumfield's preliminary hearing.[6] On June 15, 2005, Brumfield filed a new motion to suppress, making this same claim but incorporating testimony from the preliminary hearing.[7]

¶8 Within Proposition I, Brumfield contends that the information in the affidavit for the warrant to search his home was insufficient to establish probable cause for the warrant, since the affidavit failed to state that Hyde was first encountered in the bust of a separate methamphetamine lab and that she was under the influence of this drug at the time she provided information. The State correctly notes that Brumfield neglected to raise this claim in support of his suppression motions, thereby waiving it absent plain error.[8] We find no plain error in this regard.[9]

¶9 Brumfield's main Proposition I claim is that the execution of the search warrant on his home violated the Fourth Amendment's "knock-and-announce" requirement and also 22 O.S.2001, § 1228. On July 17, 2006, after the briefing in this case had been completed, the State tendered a supplemental brief discussing the impact of the United States Supreme Court's June 15, 2006, decision in *Hudson v. Michigan* on the current claim.[10] On August 22, 2006, this Court ordered that the tendered brief be filed and that Brum-

---

5. The search also revealed a night vision monocular, a police scanner (programmed with the sheriff's office frequency and turned on), and a surveillance system by which anyone approaching the home, from the front or back, could be heard and observed via bedroom monitors.

6. Judge Brock stated as follows: "The Motion to Suppress will be overruled at this time. I don't intend that to be a dispositive ruling for some other Court, but the Motion to Suppress will be overruled at this time."

7. The record in this case does not contain a response from the State regarding either suppression motion, nor does it contain any ruling from the trial court regarding the second motion.

8. *See Jones v. State*, 2006 OK CR 5, ¶24, 128 P.3d 521, 536 (citing cases), *rehearing granted on other grounds*, 2006 OK CR 10, 132 P.3d 1, *cert. denied*, — U.S. —, 127 S.Ct. 404, — L.Ed.2d — (2006).

9. This Court notes that the affidavit for search warrant describes Tiffany Hyde, listing her actual name, notes that she lived with Brumfield during the previous six months, during which time he was "cooking" methamphetamine "three times a week," and states that the previous night Hyde had done "a bump" of methamphetamine along with Brumfield and a white female. Hence the court evaluating the warrant application was specifically informed that Hyde was a user of methamphetamine and that she spent significant time around the production of this drug, and the court was quite able to consider the impact of these factors in evaluating her credibility. This same reasoning also supports this Court's conclusion that Brumfield's attorney was not ineffective for failing to challenge the issuance of the warrant under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), particularly since the affidavit did not include any false statements. Brumfield cannot establish any reasonable probability that if he had challenged the basis for the search warrant as now suggested, his motion to suppress would have been granted. Hence he cannot establish either ineffective assistance or plain error in this regard.

10. *See Hudson v. Michigan*, — U.S. —, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006).

field be allowed to respond to the State's supplemental brief. Brumfield's response brief was filed with this Court on September 5, 2006.

¶ 10 In *Hudson,* the Supreme Court recognized that "[t]he common-law principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." [11] The Court likewise acknowledged that in *Wilson v. Arkansas,*[12] the Court had concluded that the "knock-and-announce rule," for officers executing a search warrant, is constitutionally required under the Fourth Amendment.[13] Nevertheless, the *Hudson* Court held, in a 5–4 decision, that a violation of this knock-and-announce rule, by officers executing a search warrant, does not require that the evidence obtained in the subsequent search be suppressed.[14] The Court recognized three interests protected by the knock-and-announce requirement: (1) the protection of human life and limb, since unannounced entries can provoke violence from surprised residents attempting to protect themselves; (2) the protection of property, since the rule gives individuals the opportunity to avoid the destruction of property caused by a forcible entry; and (3) the values of privacy and dignity, since the rule gives people an opportunity to prepare themselves for the entry of police.[15]

¶ 11 The *Hudson* Court emphasized, however, that the rule "has never protected ... one's interest in preventing the government from seeing or taking evidence described in a warrant." [16] The *Hudson* Court then examined the "social costs" and "deterrence benefits" of applying the exclusionary rule to cases where officers violated the knock-and-announce rule.[17] The Court concluded:

> In sum, the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial—incomparably greater than the factors deterring warrantless entries when *Mapp* was decided. Resort to the massive remedy of suppressing evidence of guilt is unjustified.[18]

Hence the State argues, quite reasonably, that even if the execution of the warrant at Brumfield's home violated the Fourth Amendment's knock-and-announce requirement, the evidence obtained thereafter need not be suppressed, under the authority of *Hudson.*

¶ 12 Brumfield responds, however, also quite reasonably, that the decision in *Hudson* does not control this Court's interpretation of our own state statute, namely, 22 O.S.2001, § 1228. This provision authorizes the use of force in the execution of a search warrant on an occupied home only under two particular circumstances.[19] First, it estab-

11. *Id.* at ——, 126 S.Ct. at 2162.

12. 514 U.S. 927, 929, 115 S.Ct. 1914, 1915, 131 L.Ed.2d 976 (1995) (holding that "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment").

13. *Hudson,* —— U.S. at ——, 126 S.Ct. at 2162 (describing *Wilson* as concluding that knock-and-announce rule is "a command of the Fourth Amendment").

14. *Id.* at ——, 126 S.Ct. at 2165.

15. *Id.* at ——, 126 S.Ct. at 2165. In addition, this Court notes that the knock-and-announce requirement helps minimize the potentially harmful and even fatal consequences that can result when officers executing a search warrant serve it on the wrong residence.

16. *Id.* The Court concluded, "Since the interests that *were* violated in this case have nothing to do

with the seizure of the evidence, the exclusionary rule is inapplicable." *Id.* (emphasis in original).

17. *Id.* at ——, 126 S.Ct. at 2165–68.

18. *Id.* at ——, 126 S.Ct. at 2168 (referring to *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961) (holding that evidence obtained through unconstitutional searches and seizures is inadmissible in state court)).

19. It should be noted that this Court has long recognized that force can be used to enter a home and execute a search warrant, without compliance with § 1228, when the home is unoccupied. *See Thigpen v. State,* 1931 OK CR 51, 51 Okla.Crim. 28, 299 P. 230 (Syllabus) ("Where an officer with a valid search warrant for the search of a house finds no one upon the premises on whom a demand for admittance can be made, he may force an entry for the purpose of serving such search warrant."); *see also Pennington v.*

lishes criteria under which a "no-knock" warrant can be issued by a magistrate, thereby allowing a forceful entry without any warning, where there is reasonable cause to believe that one or more specific "exigent circumstances" exist.[20] Otherwise, § 1228 does not allow the forceful entry into a home for the execution of a search warrant, unless "[t]he officer has been refused admittance after having first given notice of his authority and purpose."[21] Although no-knock warrants were not legislatively authorized until 1990,[22] Oklahoma's statutory requirement that before an officer can use force in the execution of a search warrant, he must (1) give notice of his authority and purpose, and (2) be refused admittance, dates back to statehood.[23]

¶ 13 Furthermore, this Court has been excluding evidence obtained from searches following a violation of our § 1228 "notice of authority" and "refusal of admittance" requirements since at least as early as 1974—long before the Supreme Court's 1995 deci-

sion in *Wilson* held that "knock and announce" is constitutionally required.[24] In *Sears v. State*,[25] this Court held that the failure of officers who were executing a search warrant to comply with § 1228 necessitated reversal of the defendant's conviction for possession of marijuana with intent to distribute.[26] The *Sears* Court noted the then-recent repeal of a federal statute authorizing no-knock warrants and commented as follows:

> We believe the Legislature of the State of Oklahoma displayed foresight and wisdom by refusing to cast out our announcement of authority and purpose requirement and implementing in its stead a once-popular, and now discredited, "no knock" entrance procedure. In so doing, the Legislature stood fast by our traditional values and guarded the fundamental rights of all our citizens.[27]

■ ¶ 14 This Court's 1979 decision in *Erickson v. State* followed the approach of *Sears*.[28] And neither party has offered evi-

---

*State*, 1956 OK CR 98, 302 P.2d 170, 174–75 (following *Thigpen*).

**20.** 22 O.S.2001, § 1228(2). The statutory exigent circumstances are for when warning or other notice of entry would (a) pose a significant danger to human life, (b) allow the possible destruction of evidence, (c) give rise to the possibility of resistance or escape, (d) otherwise inhibit the effective investigation of the crime, or (e) be futile or a useless gesture. *Id.*

**21.** 22 O.S.2001, § 1228(1).

**22.** *See* 22 O.S.Supp.1990, § 1228(1) (effective Sept. 1, 1990). This original authorization for no-knock warrants applied only to cases where there was probable cause to believe that notice of entry would "pose a significant danger to human life." *Id.* The four additional exigent circumstances (listed in note 20) were adopted in 1999. *See* 22 O.S.Supp.1999, § 1228(1).

**23.** *See* R.L.1910, § 6066; *see also* C.L.Dak.1887, § 7620.

**24.** In fact, as early as 1953, in *Kelso v. State*, 97 Okla.Crim. 215, 260 P.2d 864, 866 (1953), this Court noted that "[t]he statutory restrictions surrounding the serving of a warrant in connection with the search of the house of an accused … should be strictly observed." The opinion's Syllabus likewise noted: "Before an officer to whom a search warrant is directed is authorized to

forcibly enter a house to execute a warrant, he should inform the inhabitant of his authority and he may not forcibly enter the house until he is denied admittance." *Id.* at 865 (citing 22 O.S. 1951, § 1228). The necessity of suppression was not decided in *Kelso*, however, because the defendants in that case did not file a timely motion to suppress and failed to offer any evidence in support of their claim. *Id.* at 866.

**25.** 1974 OK CR 205, 528 P.2d 732.

**26.** *Id.* at ¶¶ 6–7, 528 P.2d at 733; *see also id.* at ¶ 10, 528 P.2d at 734–35 ("[T]he officers forcibly entered the defendant's apartment without first announcing their identity and purpose and requesting permission to enter. Such action is contrary to the provisions of the law of Oklahoma as set forth by the Legislature in 22 O.S. 1971 § 1228[,] and defendant's Motion to Suppress should have been granted.").

**27.** *Id.* at ¶ 12, 528 P.2d at 735. The *Sears* Court described the federal repeal as arising "from the abuse by federal agents of the 'no-knock' search warrants[,] which resulted in terrorizing and abusing the rights of law-abiding citizens." *Id.* at ¶ 11, 528 P.2d at 735.

**28.** *See Erickson v. State*, 1979 OK CR 67, ¶¶ 3–12, 597 P.2d 344, 345–47 (reversing conviction where officer who knew someone was present in home entered home without announcing his authority or purpose) (citing and following *Sears*). The *Erickson* Court held:

dence to suggest that this Court has wavered from this approach, *i.e.*, of holding that evidence obtained in a search following a violation of § 1228, where there are no exigent circumstances, is not admissible against the homeowner.[29] Hence this Court has a long history of enforcing § 1228 through the suppression of evidence quite apart from decisions of the United States Supreme Court regarding the requirements of the Fourth Amendment. In addition, Oklahoma remains free to interpret our own state constitution, with its own protection against "unreasonable searches or seizures," [30] more broadly than the United States Supreme Court interprets the federal constitution.

¶ 15 In *Turner v. City of Lawton*,[31] the Oklahoma Supreme Court, in a civil case, traced the development of the exclusionary rule for illegally obtained evidence, both in Oklahoma and under the U.S. Constitution, and concluded that forty years prior to the Supreme Court's decision in *Mapp v. Ohio*,[32] the Oklahoma Supreme Court had incorporated the exclusionary rule into Oklahoma law.[33] *Turner* also noted that just two years later this Court likewise adopted the exclusionary rule in a criminal case.[34] The *Turner* decision broadly proclaimed the right of this State to grant protections to its citizens that are more expansive than those conferred by federal law.

> State statutes or state constitutions which afford greater rights than the federal constitution must be determined by following state law. The state of Oklahoma in the exercise of its sovereign power may provide more expansive individual liberties than those conferred by the United States Constitution.... The people of this state are governed by the Oklahoma Constitution, and when it grants a right or provides a principle of law or procedure beyond the protections supplied by the federal constitution, it speaks for every person as the supreme law and final authority for everything which is done in pursuance of its provisions.[35]

In particular, the Oklahoma Supreme Court held in *Turner* that despite contrary decisions by the United States Supreme Court, evidence that is obtained through an illegal search must be suppressed in civil proceedings in Oklahoma, just as it is suppressed in criminal proceedings.[36] Hence *Turner* provides strong support for the argument that Oklahoma's use of the exclusionary rule to enforce the protections of our own state statutes and constitution may well be substantially more expansive than the use of this rule to enforce federal law.

■ ¶ 16 Nevertheless, under the specific circumstances of the current case, we need not decide whether the search of Mr. Brumfield's home violated Oklahoma law or whether such a violation necessarily requires that the evidence discovered in the subsequent search be suppressed. For despite the fact that defense counsel vigorously raised this issue prior to Brumfield's trial, when the evidence discovered during the search of Brumfield's home and property was actually offered at trial, counsel failed to object or in

---

> [I]t is the holding of this Court that the failure of the officer named in the warrant to observe the constraints of 22 O.S.1971, § 1228, in executing the search warrant, where no extenuating circumstances existed, rendered the search and subsequent seizure invalid as a violation of the appellant's Fourth Amendment rights; the trial court's failure to sustain the appellants' motion to suppress the fruits of that search and seizure constitutes reversible error.
>
> *Id.* at ¶ 12, 597 P.2d at 347.

29. This Court does not today address the questions of whether an individual who does not live in the searched residence has standing to raise a violation of § 1228 or whether the subsequently discovered evidence should be suppressed in the non-resident's case.

30. *See* Oklahoma Constitution, Art. 2, § 30.

31. 1986 OK 51, ¶¶ 2–8, 733 P.2d 375, 376–78.

32. 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961) (extending the federal exclusionary rule to the states).

33. *Turner*, 1986 OK 51, ¶ 8, 733 P.2d at 378 (citing *Hess v. State*, 202 P. 310, 84 Okl. 73 (Okla.1921)).

34. *Id.* (citing *Gore v. State*, 218 P. 545, 24 Okl.Cr. 394 (Okla.Crim.App.1923)).

35. *Id.* at ¶ 10, 733 P.2d at 378–79.

36. *Id.* at ¶¶ 9–19, 733 P.2d at 378–81; *see also id.* at ¶ 15, 733 P.2d at 380 ("[T]his Court is unfettered in its enforcement of the Oklahoma exclusionary rule.").

any manner preserve Brumfield's claim that the evidence was unlawfully obtained. This Court has repeatedly held that in order to preserve a claim that evidence should have been suppressed, the defendant must object to the admission of the evidence at trial.[37] In the current case, where the judge who ruled on the suppression motion specifically noted that this issue could be further litigated at the trial level, Brumfield's failure to preserve this claim is particularly surprising.[38] We find that the trial court's failure to exclude this evidence on its own motion was not plain error.[39]

■ ¶17 In Proposition II, Brumfield argues that the aggravated manufacturing statute that he was convicted of violating, 63 O.S.Supp.2004, § 2–401(G)(3)(h), is unconstitutionally vague because the term "mixture" in this section lacks sufficient definiteness to provide an ascertainable standard for the determination of guilt, and because the provision fails to provide "fair notice" of what conduct is forbidden. Brumfield failed to raise any challenge to this statute at the trial court level. The parties disagree regarding the proper standard of appellate review for this claim.[40] We conclude that regardless of which standard of review we employ, this provision is not void for vagueness.

¶18 Section 2–401(G)(3) defines "aggravated manufacturing" as including the manufacture or attempted manufacture of various amounts of various different controlled dangerous substances.[41] The penalty for aggravated manufacturing is imprisonment for twenty years to life and a fine of at least $50,000, regardless of which drug was involved, as long as the specific threshold amount relevant to that drug is met.[42] For aggravated manufacture of methamphetamine, the required minimum amounts are as follows: "fifty (50) grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers."[43] Brumfield maintains that the word "mixture" in this provision is so indefinite that it renders the provision void for vagueness.

¶19 This Court has long held that "statutes creating criminal offenses must be drawn in language sufficient to apprise the public of exactly what conduct is forbid-

37. See, e.g., Jones, 2006 OK CR 5, ¶24, 128 P.3d at 536 ("An argument raised in support of a motion to suppress which is not raised at trial is waived.") (citing Young v. State, 1998 OK CR 62, ¶22, 992 P.2d 332, 339); Dunkle v. State, 2006 OK CR 29, ¶¶19–20, 139 P.3d 228, 235–36 (claim raised in suppression motion that is not renewed by objection to evidence at trial is waived and will be evaluated only for plain error). Even this Court's 1923 decision in Gore, which first recognized the necessity of excluding unlawfully obtained evidence, also recognized the necessity of "timely protest of the accused." See Gore, 218 P. at 549, 24 Okl.Cr. at 406.

38. This Court notes that Brumfield does not raise an ineffective assistance claim in this regard and also that he acknowledges his counsel's failure to preserve this claim in his reply brief.

39. Although the facts regarding the execution of the search warrant were focused upon at the preliminary hearing, they were not focused upon at trial. Hence without an objection from defense counsel, the trial court cannot be held accountable for failing to raise and decide this issue sua sponte.

40. Brumfield characterizes his claim as a challenge to the trial court's subject matter jurisdic-

tion, which can be raised at any time. He cites Hayes v. Municipal Court, 1971 OK CR 274, ¶2, 487 P.2d 974, 975 ("Unconstitutionality of a criminal statute constitutes a jurisdictional failure in the trial court entertaining a prosecution for an alleged violation of a challenged statute."). The State maintains that Brumfield's constitutional claim is like any other claim that has been waived, which can be reviewed only for plain error. The State cites Jetton v. State, 1981 OK CR 84, ¶15, 632 P.2d 432, 435–36 ("Where the question of unconstitutionality of the habitual offender statute is not presented to the trial court, not argued, and not properly preserved for review, we will not consider it for the first time on appeal.") (citation omitted).

41. These ranges vary from 10 grams or more "of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD)" to 1,000 kilograms of more of "a mixture or substance containing a detectable amount of marihuana or ... 1,000 or more marihuana plants regardless of weight." See 63 O.S.Supp.2004, § 2–401(G)(3)(e) and (g).

42. 63 O.S.Supp.2004, § 2–401(G)(3).

43. 63 O.S.Supp.2004, § 2–401(G)(3)(h).

den." [44]   A statute is unconstitutionally "vague" if ordinary people reading it cannot understand with reasonable certainty what conduct it requires or prohibits, leaving them to guess at its meaning.[45]   Such statutes are invalid because they do not give fair notice of what conduct is required or prohibited.[46]

¶ 20 In *Chapman v. United States*,[47] the United States Supreme Court addressed the meaning of the phrase "a mixture or substance containing a detectable amount of _____," in a case dealing with how lysergic acid diethylamide (LSD) found on blotter paper should be weighed.   The *Chapman* Court had little trouble concluding that the blotter paper carrying the individual doses of LSD should be included when determining the weight of the "mixture ... containing a detectable amount of" LSD.[48] The Court noted that terms like "mixture" must be given their ordinary meaning and that mixture can be defined to include "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that, however thoroughly commingled, are regarded as retaining a separate existence." [49]   The drug statute at issue in the current case uses the identical "mixture" phrase addressed in *Chapman*, in relation to various drugs that are regularly found in

something other than a pure state.[50]   And like the Chapman Court, we conclude that the use of "mixture" in this context does not make this statute void for vagueness.[51]

¶ 21 Section 2–401(G)(3)(h) reasonably defines the crime of "aggravated manufacturing" of methamphetamine as applying to those who have successfully produced 50 grams or more of methamphetamine, as well as those who have not yet completed the manufacturing process but have reached a stage at which they have produced 500 grams or more of a "mixture or substance containing a detectable amount of methamphetamine...." The statute gives fair notice of what conduct is proscribed and is readily comprehensible by persons of ordinary understanding.

¶ 22 The controversy in the current case arose when O.S.B.I. Criminalist Marty Wilson testified that the two-layer liquid found in Brumfield's home was composed of an aqueous layer and an organic/oil layer and that these two layers "don't mix."   Wilson maintained that all of the liquid in the jar, with a total mass of 1,141 grams, was still one "mixture," but his comment about the two layers not mixing created substantial controversy at trial about whether both lay-

**44.**   *Hayes,* 1971 OK CR 274, ¶ 6, 487 P.2d at 976.

**45.**   *See Wilkins v. State,* 1999 OK CR 27, ¶ 8, 985 P.2d 184, 186 ("As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.") (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)); *State v. Saunders,* 1994 OK CR 76, ¶ 5, 886 P.2d 496, 497 (same).

**46.**   *Hayes,* 1971 OK CR 274, ¶ 6, 487 P.2d at 976 ("A 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.'") (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)); *Wilkins,* 1999 OK CR 27, ¶ 8, 985 P.2d at 186 (quoting *Hayes); Saunders,* 1994 OK CR 76, ¶ 6, 886 P.2d at 497 (same).

**47.**   500 U.S. 453, 455, 111 S.Ct. 1919, 1922, 114 L.Ed.2d 524 (1991).

**48.**   *Id.* at 461, 111 S.Ct. at 1925; *id.* at 462, 111 S.Ct. at 1926 ("LSD is applied to blotter paper in a solvent, which is absorbed into the paper and ultimately evaporates.... [T]he LSD is left behind in a form that can be said to 'mix' with the paper.   The LSD crystals are inside of the paper, so they are commingled with it, but the LSD does not chemically combine with the paper.").

**49.**   *Id.* (quoting Webster's Third New International Dictionary 1449 (1986)).

**50.**   *See* 63 O.S.Supp.2004, § 2–401(G)(3)(a), (b), (d), (e), (f), (g), and (h).

**51.**   Brumfield's jury instructions included the following definition of "mixture": "a portion of matter consisting of two or more components that do not bear a fixed proportion to one another and that however thoroughly commingled are regarded as retaining a separate existence." This instruction, which is not separately challenged, comes from *Chapman* and appears to be an entirely reasonable definition of this term in this context.

ers of the liquid or simply the bottom layer (containing methamphetamine) could be counted in determining the applicability of 63 O.S.Supp.2004, § 2–401(G)(3)(h).[52]

¶ 23 We hold that the term "mixture" was properly applied to the entire volume of liquid in the jar found in Brumfield's home. The fact that the terms "mix" or "mixture" can be used to mean slightly different things in different contexts does not change the fact that the entire volume of liquid found in the jar was appropriately treated as a single "mixture" and that a person of ordinary intelligence would expect that this would be so. Although Brumfield's brief speculates about minute amounts of methamphetamine being dissolved in vast amounts of water, such hypotheticals are unhelpful and irrelevant in evaluating a situation like Brumfield's. In this case the statute is being applied to a person who all of the evidence suggests is involved in the production of a substantial amount of methamphetamine, with the subject liquid mixture being the typical and expected result of that production process. This is not a case where a trace amount of methamphetamine was detected in a tub full of bathwater.[53] Section 2–401(G)(3)(h) is not unconstitutionally vague, and it was appropriately applied to the entire contents of the liquid mixture found in Brumfield's home.

■ ¶ 24 In Proposition III, Brumfield asserts that the State's evidence was insufficient to establish that he committed the crime of aggravated manufacture of methamphetamine. As the preceding summary of facts reveals, the State's evidence was more than sufficient to establish that Brumfield committed this crime.[54] Brumfield's home and property were littered with the essential ingredients for methamphetamine manufacture—or evidence that essential ingredients had recently been present, e.g., the blister

packs—and the discovery of the jar containing the two-stage liquid (with detectable amounts of both P2P and methamphetamine) was compelling evidence that this manufacturing process had been recently undertaken by someone in his home. Furthermore, as noted in Proposition II, the entire contents of the glass jar were appropriately treated as a "mixture" containing methamphetamine.

¶ 25 Regarding Proposition IV, this Court need not address Brumfield's claim that the evidence was insufficient to establish that he committed the crime of unlawful possession of methamphetamine, because the State's concession regarding Proposition VI renders Brumfield's Proposition IV claim moot.

¶ 26 In Proposition V, Brumfield asserts that the trial court should have instructed his jury on the lesser offense of manufacture of methamphetamine, in addition to instructing on aggravated manufacture of this drug. This claim is simply another version of Brumfield's contention that the entire contents of the glass jar should not have been treated as a single "mixture." The only way Brumfield's jury could have acquitted him of the crime of aggravated manufacturing and then convicted him of simply manufacturing would have been if the jury had accepted his more narrow definition of "mixture," which this Court rejects herein as incorrect in this context. Brumfield did not request the lesser instruction, and he was not entitled to it. This claim is rejected accordingly.

■ ¶ 27 In Proposition VI, Brumfield asserts that his convictions for both aggravated manufacture and unlawful possession, based entirely on the methamphetamine contained within the liquid in a single glass jar, violates 21 O.S.2001, § 11.[55] The State concedes in

---

**52.** Wilson acknowledged that although it was possible to separate out the two layers and weigh them separately, he had not done so. Hence no evidence was presented at trial regarding the weights of the two separate layers.

**53.** Cf. Chapman, 500 U.S. at 466, 111 S.Ct. 1919 (rejecting similar claim regarding LSD statute) ("While hypothetical cases can be imagined involving very heavy carriers and very little LSD, those cases are of no import in considering a

claim by persons such as petitioners, who used a standard LSD carrier.")

**54.** See Jackson v. Virginia, 443 U.S. 307, 319–20, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 (quoting Jackson).

**55.** No other methamphetamine, in any form, was found in Brumfield's home.

its brief that convicting Brumfield of both offenses in this manner violated § 11. Consequently, Brumfield's conviction for possession of methamphetamine (Count II) must be reversed and dismissed.

¶ 28 In Proposition VII, Brumfield claims that his counsel failed to subject the State's case to meaningful adversarial testing, because counsel "completely abandoned, and/or failed to recognize the one defense that could have resulted in a different outcome for Mr. Brumfield," *i.e.*, his assertion that the State could not rely on the entire contents of the glass jar as a "mixture … containing a detectable amount of methamphetamine." To establish ineffective assistance of counsel, Brumfield must show that his counsel's performance was deficient and that he suffered prejudice as a result.[56] This Court cannot and will not find that counsel's performance was inadequate because he failed to more fully argue and pursue an incorrect definition of a statutory term. Hence this claim is rejected.[57]

¶ 29 In Proposition VIII, Brumfield asserts that the trial judge erred by not disqualifying himself from Brumfield's case, because the judge was the one who signed the warrant authorizing the search of Brumfield's home and because he was personally present while the warrant was being executed upon the home.[58] This Court has recently reviewed the proper procedure for seeking the recusal or disqualification of a trial judge in a particular case.[59] Brumfield's appellate counsel concedes that Brumfield's trial counsel did not follow this process. In fact, defense counsel never even raised the issue of recusal in the trial court.[60]

¶ 30 Appellate counsel correctly notes that the trial judge's personal involvement in the granting and executing of the warrant to search Brumfield's home could have been cited in a proper request that the judge disqualify himself from the trial of Brum-

---

56. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

57. This Court notes that within Proposition VII appellate defense counsel purports to incorporate all the arguments made in Propositions I, II, V, and IX, "to further support [Brumfield's] claim that counsel was ineffective." This is the entirety of the analysis in this regard in his initial brief. This Court will not comb through an appellate brief to see if any of the claims that have not prevailed on their own merit can be transformed into winning ineffective assistance claims. Although Brumfield's reply brief does list a number of specific potential claims of ineffective assistance—still without the requisite performance/prejudice analysis—this effort is both too little and too late.

This Court recognizes that Brumfield does specifically assert that, in a, that defense counsel failed to adequately cross examine Tiffany Hyde regarding whether it was her jeans that were used to hide the glass jar and whether she placed the jar in the washing machine. Yet Brumfield neglects to explain how he was prejudiced by this alleged inadequacy. Hence this claim is incomplete as well.

58. The prosecutor pointed out, during his opening statement, that the application to search Brumfield's home was presented to Judge Burgess and that "Judge Burgess did in fact issue the search warrant." When the prosecutor later questioned the officer who obtained the warrant, the prosecutor asked who signed the affidavit for search warrant, and the officer answered that it was "signed by myself, and Judge Burgess."

And the three documents comprising State's Exhibits 3 and 4—the Affidavit for Search Warrant, Search Warrant, and Search Warrant Return—all include the obvious signature of "Lowell R. Burgess Jr.," Judge of the District Court. (These exhibits are further addressed in Proposition IX). In addition, defense witness Tara Kensey mentioned, on direct examination, that she observed "Judge Burgess out there," during the execution of the search warrant on Brumfield's home. This testimony, however, was not elicited or emphasized by the State.

59. *See Mitchell v. State*, 2006 OK CR 20, ¶¶ 84–86, 136 P.3d 671, 705–06 (reviewing required process of pursuing recusal/disqualification claim under Rule 15, *Rules for District Courts of Oklahoma*, Title 12, Ch. 2, App. 1 (2002), and 20 O.S.2001, § 1403).

60. Shortly after being arrested in this case, Brumfield wrote a pro se letter stating that he was making "a motion to disqualify Judge Lowell R. Burgess from presiding over the above menchened [sic] cases, on the grounds he is biased and prejudiced towards me, causing a great hardship and conflict of interest." This letter cites no specific evidence of bias and is focused on Brumfield's desire to be released on an "own recogasense [sic] bond." The "motion" contained within the letter was not further pursued by Brumfield or his counsel, nor was it formally ruled upon by the trial court. Brumfield does not attempt to claim that this letter adequately preserved the current claim on appeal. And it certainly did not.

field's case.[61] However, this was not done.[62]

In *Mitchell v. State*, we recently noted:

[W]hile a defendant can waive his right to preclude a disqualified judge from hearing his case, that defendant does *not* thereby waive the right to have his trial conducted in a fair and impartial manner. Whether or not a defendant can or does establish *before* trial that a particular judge is so likely to be biased against him or her that the judge should recuse or be disqualified, the defendant is always entitled to a trial that is, in fact, fairly conducted.[63]

Unlike the *Mitchell* case, however, the current case does not involve a tenable claim that Brumfield's trial was unfairly conducted. Brumfield barely alludes to unfavorable actions by the trial judge during his trial and completely fails to establish that these actions were improper or unfair to him.[64] This Court does not approve or recommend the overlapping of roles that occurred in this case, especially since the trial judge's involve-ment in the obtaining of the search warrant was emphasized to Brumfield's jury. Nevertheless, we conclude that Brumfield has waived this claim by failing to pursue it properly. And Brumfield entirely fails to establish actual bias in the trial judge's handling of his trial, which was fairly conducted. This claim is rejected accordingly.

¶ 31 Proposition IX is a cumulative error claim mixed with allegations of prosecutorial misconduct.[65] Brumfield acknowledges that none of the issues raised in this claim were properly preserved at trial. Hence all of these issues have been waived, and we will grant relief only in the case of plain error.

¶ 32 Proposition IX includes the following allegations of error/misconduct: (1) failure to file a *Burks* notice regarding the "other crimes" testimony of Tiffany Hyde,[66] (2) improper opinion testimony from Officers Ben Milner and John Mitchell, (3) an "evidentiary harpoon" within the testimony of Milner, (4) improper expert testimony by criminalist

---

**61.** The State acknowledges that if Judge Burgess was actually present during some of the search, he "may have been a *possible* witness" in the case, but notes that "his testimony was not needed or sought by either party." The State cites *Black v. State*, 2001 OK CR 5, ¶ 12, 21 P.3d 1047, 1057, in which this Court recently addressed a defendant's claim "that if a judge signs the search/arrest warrants in a case, that judge is necessarily biased/interested in the subsequent preliminary hearing." The States invokes the following finding from *Black*:

[T]he act of signing search and arrest warrants does not constitute the type of interest in a proceeding that would automatically prohibit the issuing judge from presiding at the subsequent preliminary hearing[,] absent some evidence that his conduct is somehow intertwined in the issuance of the warrants as to compromise his impartiality. *See* 20 O.S.1991, § 1401.

*Id.* at ¶ 13, 21 P.3d at 1057. Hence *Black* would have had some relevance for deciding a disqualification claim like the one Brumfield now attempts to make, though a few distinguishing points seem noteworthy.

*Black* involved a preliminary hearing rather than a trial; hence *Black* did not involve the issue of how knowing that the trial judge had authorized the arrest or search of the defendant (or his property) could potentially impact a jury. Furthermore, this Court's conclusion that the mere fact that a particular judge has signed search or arrest documents in a case does not "necessarily" or "automatically" mean that the judge is biased or interested in the case, so as to preclude his participation in it, is certainly not an endorsement of the practice. Brumfield also could have made the argument that by overseeing the actual search of his home—if this is indeed true—the trial judge had "intertwined" himself in the case. This Court today takes no position, however, on these waived arguments.

**62.** And Brumfield fails to specifically articulate an ineffective assistance claim in this regard.

**63.** *Mitchell*, 2006 OK CR 20, ¶ 87, 136 P.3d at 706 (emphasis in original).

**64.** Brumfield simply notes that, while presiding over his trial, Judge Burgess "overruled defense counsel's motion to suppress, interjected his own objections to defense counsel's statements and questions, and reprimanded defense counsel in the presence of the jury." Brumfield also notes that the judge failed to instruct on the lesser offense of simple manufacturing. This Court has already addressed the suppression and lesser-offense instruction issues; and none of the cited examples, even considered cumulatively, establish that the trial judge was biased against Brumfield or that his trial was unfair.

**65.** Brumfield attempts to throw in an "alternative" ineffective assistance (backup) claim, but does nothing to develop it.

**66.** *See Burks v. State*, 1979 OK CR 10, ¶¶ 11–20, 594 P.2d 771, 774–75, *overruled on other grounds, Jones v. State*, 1989 OK CR 7, 772 P.2d 922.

Marty Wilson, (5) improper admission of the search warrant documents, (6) failure to provide discovery regarding the potential testimony of Brumfield's son, and (7) improper prosecutorial argument. We take up these claims in turn, evaluating them for plain error.

¶ 33 Regarding the testimony of Tiffany Hyde, although no *Burks* notice was filed, Brumfield was not surprised by this testimony, and admission of the testimony was either proper or did not constitute plain error.[67] The challenged testimony of Officers Milner and Mitchell was proper, based upon their experiences, and did not simply tell jurors what result to reach in the case.[68] The challenged "evidentiary harpoon" was appropriately interrupted by defense counsel and was not completed.[69] This Court concludes that although the developing testimony was potentially improper, it was not completed, was very limited, and did not render Brumfield's trial unfair. Regarding Brumfied's expert testimony claim, Wilson's rebuttal testimony about whether the two-layer liquid was a single "mixture" was not improper and was an appropriate attempt to clarify his earlier testimony about the two layers "not mixing."

■ ¶ 34 Regarding the admission into evidence of the search warrant documents (State's Exhibits 3 & 4), Brumfield correctly notes that this Court has held that such documents should not be admitted in a criminal trial.[70] Yet we have also recognized that the admission of these search-related documents does not necessarily cause prejudice or constitute plain error, particularly where the evidence contained therein was cumulative to other evidence presented at trial.[71] We conclude that the admission of the search warrant documents in the current case did not constitute plain error or unfairly prejudice Brumfield. Almost all of the information contained within these documents was cumulative to the trial testimony of Tiffany Hyde and Officers Milner and Mitchell. Brumfield notes that certain pieces of information within these exhibits were not cumulative to other evidence, including the finding in Brumfield's home of a surveillance system, a 9 mm pistol, night vision equipment, and "Misc. Ammo." While this specific evidence did carry the potential for prejudice, it was not emphasized to Brumfield's jury. We conclude that the trial court did not commit plain error by admitting this evidence and that Brumfield's trial was not rendered unfair thereby.

■ ¶ 35 Regarding the testimony of defense witness John Paul Brumfield, the defendant's son, Brumfield fails to establish that the State committed a discovery violation by failing to disclose that this defense witness (whom the State did not endorse) was a paid informant and had helped State agents find evidence of methamphetamine production on his father's property.[72] While the defendant appears to have been sur-

67. In addition, Brumfield's jury was correctly instructed regarding the limited purpose of "other crimes" evidence.

68. *See Romano v. State*, 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109.

69. During questioning by defense counsel, Officer Milner volunteered that while meeting with Tiffany Hyde, he talked to her about "the people who manufacture and distribute methamphetamine" and about how "when they get young girls such as herself ... [who themselves take methamphetamine] ... how they become basically slaves to these people, for pervert ..." Defense counsel objected at this point and argued that the testimony was an evidentiary harpoon. (Thus Brumfield preserved this claim in the trial court.) Although the trial court overruled the objection, since defense counsel had asked the preceding question, the trial court did not allow Milner to finish his answer, and the issue was not mentioned again.

70. *See, e.g., Royal v. State*, 1971 OK CR 442, ¶ 2, 490 P.2d 777, 777 ("This Court has repeatedly held that as the recitations of the Affidavit and of the Search Warrant were with reference to the offense charged, admission of the Affidavit and Search Warrant as independent evidence was prejudicial error.") (citations omitted).

71. *See Short v. State*, 1999 OK CR 15, ¶ 29, 980 P.2d 1081, 1095 (denying relief where admission of actual search warrant and accompanying affidavits was not objected to at trial and where evidence contained therein was "merely cumulative to other evidence already before the jury").

72. *See* 22 O.S.2001, § 2002; *see also Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

prised by the testimony of his son at trial, Brumfield fails to establish that his son's testimony was "exculpatory" or that the State was otherwise obligated to disclose its awareness that perhaps Brumfield's son should not have been called to testify as a witness at trial.

¶ 36 Regarding Brumfield's claim that the prosecutor improperly vouched for and bolstered State witnesses and expressed his personal opinion regarding Brumfield's veracity, we conclude that no plain error occurred. The prosecutor's statements regarding its witnesses were valid credibility arguments and did not constitute improper vouching. Regarding the prosecutor's statement about Brumfield's testimony and lack of credibility—that it was the prosecutor's personal experience that defendants rarely take the witness stand and admit their offenses—defense counsel's objection to this argument was properly sustained by the trial court. Although the prosecutor's remark was improper, it was not inflammatory, and Brumfield's trial was not rendered unfair thereby.

¶ 37 This Court has fully evaluated Brumfield's claims and reversed his Count II conviction for possession of methamphetamine based upon the State's concession that, under the facts of this case, it violated Section 11 to convict him on this count. Hence this count should be reversed with instructions to dismiss. We have addressed all of Brumfield's other claims, many of which were not properly preserved in the trial court, and we find that although his trial was not perfect, it was, on the whole, fairly conducted. Consequently, this Court concludes that even considering the "cumulative effect" of the errors and misconduct discussed herein, Brumfield's conviction for aggravated manufacture of methamphetamine should be affirmed.

### Decision

¶ 38 Robert D. Brumfield's conviction and sentence for Aggravated Manufacture of a Controlled Dangerous Substance (Metham-

phetamine) are **AFFIRMED.** His conviction for Unlawful Possession of a Controlled Dangerous Substance (Methamphetamine), however, is **REVERSED** and **DISMISSED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, A. JOHNSON and
LEWIS, JJ.: concur.

LUMPKIN, V.P.J.: concur in part/dissent in part.

LUMPKIN, V. P.J.: concur in part, dissent in part.

¶ 1 I concur with the outcome the Court reaches today, insofar as it affirms Appellant's conviction and sentence for Aggravated Manufacture of a Controlled Dangerous Substance and reverses Count II, following the State's concession of error. However, I dissent to the Court's reasoning, which includes lengthy dicta on proposition one concerning the "knock and announce" issue and a so-called "more expansive" interpretation of our state statutes and constitution than that available vis-à-vis the federal constitution's fourth amendment. I find these eight pages of dicta are not only unnecessary, but are also wrong, confusing, and in the long run counterproductive to our overall jurisprudence.

¶ 2 As this Court in Long[1] and DeGraff[2] long ago recognized, the substance of Article 2, § 30 is "identical" to that of the Fourth Amendment to the U.S. Constitution, the former being "almost an exact copy" of the latter. For that reason this Court has consistently interpreted these provisions as two sides of the same coin.[3]

¶ 3 Historically, we could have originally interpreted our state constitution different than the U.S. Constitution, but we did not. Our jurisprudence now binds us to that interpretation. If we are to adhere to the concept

**1.** 1985 OK CR 119, ¶¶ 5–6, 706 P.2d 915, 916–17.

**2.** 1909 OK CR 82, 2 Okl.Cr. 519, 528, 103 P. 538, 541 (1909).

**3.** See my writings on similar claims in *Harris v. State,* 1989 OK CR 15, ¶ 2, 773 P.2d 1273, 1275; *Dennis v. State,* ¶ 2, 1999 OK CR 23, 990 P.2d 277, 287.

of the "Rule of Law", then we must be consistent in the application of the law as formulated through its historical development.

¶ 4 While the Oklahoma Supreme Court's decision in *Turner v. City of Lawton*[4] may be interesting, in the law review sense, it has little or no relevance to the case before us.[5] The decision, insofar as the criminal law is concerned, is pure dicta. Moreover, the state Supreme Court failed to acknowledge or apply this Court's consistent interpretation of Art. 2, § 30 being in line with the Fourth Amendment, an interpretation that dates back to statehood.[6] Thus, the Court missed or disregarded the historical development of our Constitutional interpretation in criminal cases. Using that case here, then, is an exercise in futility.

¶ 5 Indeed, the opinion admits its lengthy analysis of the exclusionary rule is dicta, i.e., "we need not decide whether the search of Mr. Brumfield's home violated Oklahoma law or whether such a violation necessarily requires that the evidence discovered in the subsequent search be suppressed." The opinion then proceeds to find the alleged error was waived.[7]

¶ 6 In my opinion, however, the case can be disposed of under the statute on the basis that officers knocked and announced their presence, but were refused admittance. 22 O.S.2001, § 1228(1).

---

4. 1986 OK 51, 733 P.2d 375.

5. More interesting, however, is how today's opinion would use a twenty-year old decision from a state court with no criminal jurisdiction to maneuver around *Hudson v. Michigan*, — U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56, a 2006 decision of the highest court of the land.

6. Indeed, while citing to three of our cases, the Oklahoma Supreme Court was simply arguing that we had adopted the exclusionary rule, in light of U.S. Supreme Court decisions construing the Fourth Amendment. Those U.S. Supreme Court decisions did not end in 1986, but have continued, as demonstrated by *Hudson v. Michigan*.

7. Because the issue raised is disposed of on waiver, the opinion's discussion of the "knock and announce" rule, resolves nothing in the case and is as pertinent to our appellate jurisdiction as my own thoughts on, say, pop culture.