2009 OK CR 27

**Clifford Dale DARITY, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2007–1192.

Court of Criminal Appeals of Oklahoma.

Oct. 2, 2009.

J.P. Longacre, Carl Leforce, Jerry Mccombs, John Bounds, Idabel, OK, attorneys for defendant at trial.

Gloyd L. McCoy, Noble, OK, attorney for appellant on appeal.

Laura Willis, District Attorney, Laurie Pollard, Idabel, OK, attorneys for the state at trial.

W.A. Drew Edmondson, Attorney General, Theodore M. Peeper, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

LEWIS, Judge.

¶ 1 Clifford Dale Darity, Appellant, was tried by jury in the District Court of McCurtain County, Case Number CF–2006–519, and found guilty of Count I, trafficking illegal drugs, in violation of 63 O.S.Supp.2004, § 2–415; Count II, possession of a controlled substance with intent to distribute within 2,000 feet of a school, in violation of 63 O.S.Supp.2005, § 2–401(F); and Count III, unlawful possession of drug paraphernalia, in violation of 63 O.S.2001, § 2–405(B). The jury sentenced Appellant to forty (40) years imprisonment and a $100,000 fine on Count I, life imprisonment and a $200,000 fine on Count II, and one (1) year in the county jail and a $1,000 fine on Count III. The Honorable Michael DeBerry, Associate District Judge, imposed judgment and sentence accordingly. Mr. Darity appeals.

## FACTS

¶ 2 On October 12, 2006, state and federal law enforcement agents executed a search warrant on Appellant's mobile home and a nearby shop building located about 1,400 feet from a public school in Eagletown, Oklahoma. The searchers discovered and confiscated over 152 grams of what proved to be methamphetamine in various containers, three sets of digital scales, more than three pounds of marijuana in various packaging, 24 grams of cocaine, and over $14,000.00 in cash.

¶ 3 For safety reasons, the agents who obtained the search warrant planned in advance to conduct the search when Appellant was away from the residence. In connection with this plan, they knew Appellant had re-ported a break-in at his business. On the day of the search, a property crimes investigator arranged to meet Appellant at his place of business to discuss the break-in investigation. When Appellant arrived at the business for the meeting, the property crimes investigator signaled the waiting search team. An investigator then went to the door of Appellant's mobile home, announced "Police. Search warrant," and knocked. Hearing no response inside, he forcibly entered the residence. Agents then made an initial protective sweep of the premises and secured the nearby shop. Appellant's wife soon arrived at the residence, along with her young child. An officer informed Mrs. Darity that he had a search warrant for the residence and that she was not under arrest at that time. Police then searched and detained Mrs. Darity and continued their search of the premises.

¶ 4 According to the agents' plan, if they developed probable cause to arrest Appellant during the search they intended to arrest him immediately at his place of business. During the initial sweep of the residence, the agents discovered marijuana in plain view. Two agents then left the residence, drove the short distance to Appellant's business, and arrested him for possession of marijuana. In the search of his person incident to arrest, the agents seized $960 from his person as evidence. After being advised of his *Miranda* rights, Appellant confessed that the drugs and paraphernalia in the house belonged to him, telling the agents to "put it all on me." Appellant was transported to the McCurtain County Jail. During the remaining search of the premises, the agents recovered the trafficking quantity of methamphetamine, the cocaine, digital scales, and cash. Mrs. Darity was subsequently released and never charged. Appellant denied possession of the contraband in his testimony at trial.

## ANALYSIS

¶ 5 The Court granted oral argument in this case, which was largely devoted to a consideration of Appellant's Proposition Five.[1] In that claim, Appellant argues that

1. Appellant raised the following propositions on appeal: (1) The search warrant in this case was

the search party violated the requirements of 22 O.S.2001, § 1227 by failing to personally serve him with a copy of the search warrant, and the resulting evidence must be suppressed. Appellant filed a motion to suppress the evidence on this ground in the District Court. After hearing argument of counsel, the District Court denied the motion. We review a ruling on a motion to suppress evidence for abuse of the District Court's discretion. *Gomez v. State*, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141–42. The burden of proving the invalidity of a search warrant rests on the accused who seeks to suppress the resulting evidence. *Daniels v. State*, 1967 OK CR 165, ¶¶ 4–6, 441 P.2d 494, 495–96. Although defense counsel presented argument to the Court concerning the alleged failure to serve Appellant with a copy of the warrant, the record contains no actual evidence to support the claim. In fact, the search warrant return filed after the search recites that the same was served on Appellant. As the burden to produce any contrary evidence was Appellant's, we have no basis on this record to say that the District Court abused its discretion in denying the motion to suppress.

■ ¶ 6 We find it appropriate to also discuss Appellant's argument that the agents' diversionary tactic of having Appellant meet another officer elsewhere, and executing the warrant when Appellant was away from the scene, amounted to an unlawful evasion of the personal service requirements of section 1227 and invalidated the search. In answer to this question, we first turn to the language of the statute itself:

A search warrant may in all cases be served by any of the officers mentioned in its direction, but by no other person except in aid of the officer, on his requiring it, he being present, and acting in its execution.

We faced a similar argument concerning the proper service of warrants and section 1227 in *Pennington v. State*, 1956 OK CR 98, 302 P.2d 170. In that case, officers searched a residence when the occupants were not present and left a copy of the search warrant inside the residence on a television set. The defendants found the warrant on their return and moved to suppress the evidence due to a violation of section 1227.

¶ 7 The appellants in *Pennington* argued that because section 1227 made "no provision as to what constitutes service of the search warrant," the Court must apply a strict construction under which personal service on the defendant is required. *Pennington*, at ¶ 9, 302 P.2d at 173. We rejected such an absolute rule, for reasons that bear repeating here:

We are of the opinion that to so hold would constitute a narrow and strained construction since all the constitution requires is that the search and seizure be reasonable. If such were not the case, reasonable efforts of the officers to enforce the law against the possession of contraband would oftentimes convert what in fact is a reasonable search and seizure into an unreasonable one by judicial construction. In the absence of express provisions in 22 O.S. 1951 § 1227 as to the method of service of a search warrant, we are therefore limited only by the constitutional inhibition against unreasonable searches and seizures. What is reasonable is what is ordinarily fair and if the manner of service is such as does not subject the defendant to unreasonable treatment, the same will meet the requirements of both the law and justice.

*Id.* at ¶ 10, 302 P.2d at 173–74.

¶ 8 The Court in *Pennington* found the language of section 1227 ambiguous regard-

void *ab initio;* the U.S. Forestry Agent had no authority to seek and obtain a warrant from a state judge to search a residence in Eagletown, Oklahoma; (2) The trial court erred in failing to order that the identity of the confidential informant be disclosed; (3) The trial court committed reversible error in failing to suppress certain statements of Mr. Darity which were the "fruit" of an improper seizure and arrest; (4) The search warrant was lacking in probable cause; the evidence seized in the alleged residence must be suppressed; statements made after the execu-

tion of the search warrant must be suppressed as "illegal fruit of the poisonous tree;" (5) The evidence seized from the alleged residence of Mr. Darity must be suppressed as the warrant was not executed as required by Oklahoma law; (6) Mr. Darity was denied a fair trial due to improper remarks made by the prosecutor; (7) Two convictions for trafficking drugs violates state and federal prohibitions against double jeopardy and multiple punishments; (8) There was insufficient evidence to support two of the convictions.

ing the proper manner of service, and turned to another legislative source, the language of now-repealed 37 O.S.1951, § 84, which set forth a more specific procedure for the service of search warrants involving violations of the prohibitory act:

A copy of said warrant shall be served upon the person or persons found in possession of any such liquor, furniture or fixtures so seized, and if no person be found in the possession thereof, a copy of said warrant shall be posted on the door of the building or room wherein the same are found.

37 O.S.1951, § 84 (repealed, 1959). The Court then read sections 1227 and 84 together as "an exposition of legislative policy," from which it derived the rule that "where personal service is possible the same should be made and substituted service should not be resorted to." *Pennington*, at ¶ 12, 302 P.2d at 174. Based upon this construction of the statutes, the Court held in *Pennington* that service of a search warrant by leaving a copy of the warrant in an unoccupied dwelling, where it was found by the defendant after the search was concluded, did not violate the defendant's statutory right to personal service under section 1227. *Id.* at ¶ 16, 302 P.2d at 175.

¶ 9 *Pennington* demonstrates that personal service of a search warrant has never been a *condition precedent* to a reasonable search under the Oklahoma Constitution or any act of the Oklahoma Legislature. *Pennington's* rule of personal service "where possible" arises solely from a statutory interpretation of this Court based, at least in part, on the language of a repealed statute. The proper limits of this rule are shown in cases decided before and after *Pennington*, in which the Court historically has required personal service only where officers executing the warrant found some person *present within* and *in charge of the premises* to be searched at the time the search warrant is executed. *Borchers v. State*, 1936 OK CR 49, 59 Okl.Cr. 116, 56 P.2d 922 (officers searching unoccupied residence violated statutory service requirement by failing to post copy of the warrant on the door); *Thompson v. State*, 1949 OK CR 78, 89 Okla.Crim. 383, 208 P.2d 584 (service on eighteen year-old boy who was in charge of premises complied with section 1227); *Walker v. State*, 1950 OK CR 118, 92 Okla.Crim. 247, 222 P.2d 766 (failure to serve copy of warrant on employee in charge of premises at time of search rendered search illegal under section 1227); *Edwards v. State*, 1951 OK CR 162, 95 Okla. Crim. 37, 239 P.2d 434 (failure to serve copy of warrant on thirteen year-old boy found within premises did not invalidate search where child was not in charge of premises or in possession of contraband).

¶ 10 In *Thompson*, supra, where the Court was applying the more restrictive terms of service found in the text of 37 O.S.1951, § 84, the Court said:

This section would indicate that it would be required *if a person was present* and in possession of the liquor contraband *a copy of the warrant should be served upon such person.* The record herein clearly supports a compliance of the statute in this regard. Under the defendant's theory the search could not be had in absence of service of the warrant ... Such a contention is clearly not within the contemplation of the provisions of the statute ... *While ordinarily the law contemplates if some person is present and in possession of the place to be searched the warrant will be served, before the search is commenced, but it is not always essential to a valid search, for it is not always possible so to do in the enforcement of the law.* It is therefore apparent that *personal service of the warrant before search is commenced is not essential* to a valid search and seizure.

89 Okla.Crim. at 385–86, 208 P.2d at 586 (emphasis added). A much earlier interpretation of the same statute (when it was codified as section 7009 of the Compiled Oklahoma Statutes of 1921) in *Sturns v. State*, 1930 OK CR 84, 46 Okla.Crim. 322, 287 P. 805, was to the same effect: "The statute is mandatory and requires the officer to serve a copy of the search warrant upon the person or persons *found in possession of the building, if any are in possession* where the liquors are found." *Sturns*, 46 Okla.Crim. at 325–26, 287 P. at 806.

¶ 11 The strict rule of personal service for which Appellant contends in this case was also rejected expressly in *Walker*, supra, where the Court held that personal service was not required *on the tenant*, in whose name the searched rooms were registered, because the tenant "was at no time *present when the search was made or appeared on the scene* while the same was in progress." *Walker*, 92 Okla.Crim. at 250, 222 P.2d at 768 (emphasis added). The following year, in *Edwards*, supra, the Court stated that the purpose of personally serving the warrant is "to lessen the likelihood of resistance to the search and that such interested party may know that the search is by authority of law." *Edwards*, 95 Okla.Crim. at 39, 239 P.2d at 437. This purpose is substantially diminished when no one is found present within the premises at the time of search. *Knowlton v. State*, 1978 OK CR 11, ¶ 7, 574 P.2d 1059, 1062 ("[s]ince the defendant was not present with the vehicle when it was searched, personal service [of the search warrant] upon him was not an essential requirement of a lawful search"), *citing Howe v. State*, 1947 OK CR 64, 84 Okla.Crim. 279, 181 P.2d 571, *Pennington v. State*, supra, and 79 C.J.S. *Searches and Seizures*, § 83f.

¶ 12 Personal service of the warrant on a person found within the premises at the time of the search protects both officers and occupants by discouraging resistance and informing those within the premises that the intrusion is under lawful authority. However, personal service on persons located elsewhere when the warrant is executed is unnecessary to ensure the reasonableness of the search or protect the legitimate interests of the parties affected. Other statutes serve to safeguard the liberty and property interests of persons affected by execution of a search warrant on their property. 22 O.S. 2001, §§ 1233–1240. These laws provide for a publicly filed inventory of the search, delivery of an inventory to the person whose property was seized, the right to judicial hearing on the issuance of the warrant, the right to restoration of property unlawfully seized, and criminal sanctions against officers who maliciously procure warrants without probable cause or execute them with "unnecessary severity." 22 O.S.2001, §§ 1233–1240.

¶ 13 Appellant argues that the agents' efforts to divert him from the scene of the intended search amounted to official misconduct and a purposeful evasion of the duty to serve the warrant on him personally under section 1227. We disagree. In *Swink v. State*, 1976 OK CR 219, 554 P.2d 795, this Court held that a deception practiced against unwitting defendants by undercover officers, who thereby secured an invitation to defendant's house to purchase drugs, did not violate the Fourth Amendment or invalidate the seizure of incriminating evidence. The Court in *Swink* noted that "[t]he Supreme Court has long recognized that the use of deception by law enforcement officials in the detection of crime is not in itself improper." *Id.* at ¶ 5, 554 P.2d at 797, *citing Grimm v. United States*, 156 U.S. 604, 610, 15 S.Ct. 470, 472, 39 L.Ed. 550, 552 (1895), *et al.* Likewise, nothing in the Oklahoma Statutes or Constitution requires that police always deal truthfully with the targets of criminal investigations. *Pierce v. State*, 1994 OK CR 45, 878 P.2d 369 (rejecting claim that statements made to police in attorney's office were inadmissible because police deceived appellant during the interview); *see also Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (officers lawfully obtained confession by falsely telling suspect that his cousin had already confessed).

¶ 14 In *Carr v. State*, 1952 OK CR 112, 96 Okla.Crim. 16, 248 P.2d 251, this Court rejected a similar argument that an official ruse in the execution of a warrant violated the personal service requirement of 37 O.S. 1951, § 84. In *Carr*, three deputies with a search warrant for liquor devised a plan for the first officer to obtain an invitation to defendant's home on the pretense of buying whiskey, the purpose of the ruse being to quickly locate the hiding place of liquor on the premises. 96 Okla.Crim. at 16–17, 248 P.2d at 251–252. According to plan, the first deputy knocked at the door and the wife of defendant answered. Rather than serving the search warrant at that time, the deputy expressed interest in a purchase of liquor. The wife first denied having liquor to sell, but after the deputy told her that a particu-

lar person sent him, she agreed to get the whiskey. The deputy followed her through the house to the back door and outside, where she entered a garage. The other two deputies immediately joined the first deputy in the yard. When the wife appeared from the garage with a bottle of whiskey, the first deputy served her with the search warrant, searched the garage and located the whiskey, which was hidden by sliding panels. Like the instant case, the defendant later told the officers that the whiskey did not belong to his wife, but to him. His trial and conviction followed. *Id.*

¶ 15 Carr appealed his liquor possession conviction on grounds almost identical to those before us: "[T]he search warrant herein was not served in the manner as required by statute, and that an unlawful search was made and begun in violation of the constitutional rights of the defendant." 96 Okla. Crim. at 16, 248 P.2d at 251. The case first reiterates a point made in several other cases cited above: Personal service of the warrant *on the defendant* was not required, because he was *not within the premises* at the time of its execution. The Court said "the only question that presents itself from the facts stated, is *whether or not the artifice of the officer prior to serving the warrant* and search would preclude the state from using the liquor discovered by reason of such conduct in evidence in the prosecution for unlawful possession, that followed." 96 Okla.Crim. at 17, 248 P.2d at 252 (emphasis added).

¶ 16 The Court in *Carr* held that the officers could properly effect personal service of the warrant by handing it to the defendant's wife after gaining their initial entry by de-

ceiving her. *Id.* The Court cited numerous prior cases where officers used trickery or deception to obtain evidence, and said the question of whether officers can use this type of artifice to obtain evidence of criminal activity "has been long settled in this jurisdiction." *Id.*, citing *Tipton v. State*, 80 Okla. Cr. 49, 156 P.2d 825; *Finley v. State*, 91 Okla. Cr. 137, 217 P.2d 189; *Caveness v. State*, 3 Okla. Cr. 729, 109 P. 125; *Stack v. State*, 4 Okla. Cr. 1, 109 P. 126; *Medlock v. State*, 66 Okla. Cr. 27, 89 P.2d 377; *Hiatt v. State*, 67 Okla. Cr. 372, 94 P.2d 262. Taking the Appellant's view of the facts in this case, the agents here procured his absence from the premises by diverting him to another location and receiving a signal to begin their search once he had arrived. We see no important difference between the diversion used here and the artifice used in Carr, and no violation of Appellant's statutory or constitutional rights.[2]

¶ 17 Appellant's argument for a strict rule of personal service contains a certain irony, as law officers have on other occasions been criticized for *needlessly* entering into confrontations with occupants during service of arrest and search warrants, which they might have avoided if those likely to resist were drawn away from the scene, even by means of an official ruse. The shootings at Ruby Ridge, Idaho, the loss of life in Waco, Texas, and the service of a warrant which resulted in the shooting death of an Oklahoma Highway Patrolman are constant reminders of the foreseeable dangers in the execution of search warrants. The diversionary tactic used by the agents in this case kept the peace during the execution of a

---

2. Cases involving official deception or artifice in the execution of search and arrest warrants in several jurisdictions reach the same conclusion. *State v. Bentley*, 132 Idaho 497, 975 P.2d 785, 787–89 (1999) (officers lawfully maneuvered defendant out of house and onto his driveway to arrest him with warrant, using phony request for car registration); *United States v. Vasiliavitchious*, 919 F.Supp. 1113, 1117 (N.D.Ill.1996) (arrest was valid where officers lured suspect outside with false story that someone had broken into his car); *United States v. Contreras–Ceballos*, 999 F.2d 432, 435 (9th Cir.1993) (police deception used to induce occupant to open door did not implicate knock and announce rule); *People v. Witherspoon*, 216 Ill.App.3d 323, 160 Ill.Dec.

76, 576 N.E.2d 1030, 1036 (1991) (finding no violation where police officers lured defendant from apartment to serve warrant by activating his car alarm); *United States v. Rengifo*, 858 F.2d 800, 804 (1st Cir.1988) (agents could properly lure suspects from motel room to arrest them); *People v. Moore*, 105 Ill.App.3d 264, 61 Ill.Dec. 147, 434 N.E.2d 300, 303 (1982) (officers induced defendant to leave his home by falsely telling him he was not target of investigation); *People v. Sunday*, 109 Ill.App.3d 960, 65 Ill.Dec. 461, 441 N.E.2d 374, 378–79 (1982) (deception to lure defendant from his home to arrest him without a warrant did not violate fundamental fairness).

warrant and did not result in violation of Appellant's statutory or constitutional rights.

¶ 18 When the Court interpreted the scope of section 1227 in *Pennington*, it began from the important premise that "all the constitution requires is that the search and seizure be reasonable." *Id.* at ¶ 10, 302 P.2d at 173. This Court has never held that the Constitution or the Oklahoma Statutes require personal service of a warrant on someone who is not present within the premises to be searched, and we decline to take this extraordinary step now. In *Pennington*, our predecessors wisely avoided an interpretation of section 1227 which would "convert what in fact is a reasonable search and seizure into an unreasonable one by judicial construction." *Id.* at ¶ 10, 302 P.2d at 173. The search in this case complied with statutory and constitutional law. Appellant's motion to suppress was properly denied. His remaining assignments of error warrant no relief.

## DECISION

¶ 19 The Judgment and Sentence of the District Court of McCurtain County is **AFFIRMED.** Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J. and CHAPEL, J.: Dissent.

A. JOHNSON, V. P.J. and LUMPKIN, J.: Concur.

C. JOHNSON, P.J., Dissenting.

¶ 1 The Oklahoma Constitution clearly expresses our State's preference for prior judicial approval of how searches of private property are conducted. Okla. Const. Art. II, § 30; *Dale v. State*, 2002 OK CR 1, ¶ 7, 38 P.3d 910, 911–12. Through enactment of various statutes, our Legislature has elaborated on how search warrants should be sought, approved, and executed. These statutes are not merely suggestions. We must presume that they have some legitimate purpose behind them. One such requirement is that a search warrant be personally served on the owner of the premises. 22 O.S.2001, § 1227. There are, in fact, several good reasons for personally serving the property owner before a search warrant is executed. Personal service saves time and minimizes property damage, since the owner may choose to cooperate with the authorities and tell them where the evidence they are seeking can be found. It shows a modicum of respect to the citizen who, though his property may be subject to lawful search, is still presumed innocent. It helps police avoid mistakes, such as searching the wrong premises, whether due to misdescription in the warrant itself, or to police error in the field. It can also reduce the risk of danger, both to the officers executing the warrant, and to anyone who may be inside the premises.[1]

¶ 2 Our Legislature has enacted other laws regarding search warrants which promote these same goals. If police believe that exceptional circumstances warrant departure from these rules, they must generally seek the approval of the magistrate first.[2] In this case, the subterfuge employed by the police was unnecessary. The police could have, and should have, presented their safety concerns to the magistrate, instead of concocting a scheme on their own to lure the defendant from the premises before the search. I continue to believe that the Legislature has the authority to prescribe the methods police may use to obtain and execute warrants, even if other methods, not statutorily authorized, might be considered "reasonable" under

---

1. *Cf. Michigan v. Summers*, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), and *Rochon v. State*, 2008 OK CR 1, ¶ 11, 176 P.3d 362, 365 (noting that many of these same goals are furthered when a property owner or occupant is detained at the premises during the search).

2. *See* 22 O.S.2001, § 1228 (specifying that officer executing warrant must knock and announce his presence, giving the occupant an opportunity to permit peaceful entry, unless a magistrate has previously found the circumstances require otherwise); 22 O.S.Supp.2005, § 1230 (providing that search warrants for occupied dwellings may only be served during certain times of the day, unless a magistrate has previously found the circumstances require otherwise).

our constitution. *See Dodson v. State,* 2006 OK CR 32, ¶ 15, 150 P.3d 1054, 1058.

¶ 3 There clearly was a "ruse"; the officers concocted a scheme to get the homeowner away from the property. This was clearly State action, a "ruse" to avoid personal service and is unacceptable behavior by the police. If the police were afraid for their safety or the safety of others, Oklahoma law allows for even a "no knock search". This could have been used, but the "ruse" was used to avoid service and not for protection of the officers. I respectfully dissent.

CHAPEL, J., Dissenting.

¶ 1 I dissent from the opinion of the Majority because service was not achieved in this case, and because it is unjustifiable to grant the police unchecked power to use fraud to evade the statutory protections securing the constitutional rights of our citizens.[1] I also dissent to affirming the sentences in this case as they are grossly disproportionate and excessive by any legitimate standard. Indeed, the sentences here are excessive, in my opinion, even under the non-standard by which this Court typically "reviews" sentences.

¶ 2 The Majority devotes one paragraph to its summary conclusion that because a return of service was filed along with the inventory of the search, Darity failed to establish deficient service and failed to meet his burden on the motion to dismiss. This conclusion is wholly inconsistent with the facts in the record. Darity was not served with the warrant prior to the search. Rather, without judicial oversight, Agent Alford organized a "ruse" to lure Darity from his home and initiate a search without Darity's knowledge or presence. As part of the ruse, Officer Willis arranged for Darity to leave his home and go to his place of business. Once Darity arrived, Willis called the search team and gave them the go-ahead to search the private residential property. The search team conducted an initial search of all buildings on the Darity property, looking in all places in which a person could be found, including in cabinets, in closets and under beds. The police found marijuana and scales during this search. Officer Willis was instructed that, while the search was proceeding, he should not inform Darity about the search warrant. Though the Majority calls this initial search a "protective sweep," our firm precedent recognizes that the execution of the warrant occurs, and the search commences, once the police cross the threshold of a citizen's

---

1. Courts have opened a Pandora's box by sanctioning police lies. The "ends justify the means" rationale employed by most courts is very difficult to limit, and thus, the circumstances of "permissible deceit" have increased. So too has the evidence of "unlawful deceit." How does a law enforcement officer accept a message that it is permissible to lie to obtain evidence, but not permissible to lie in a suppression hearing when the conviction or release of a murderer is in the balance. Empirical studies demonstrate that police are lying both in and out of court. *See* Capers, *Crime, Legitimacy, and Testilying,* 83 Ind. L.J. 835, 836, 868–871 and n. 6 (2008) (*citing* studies and reports including Comm'n to Investigate Allegations of Police Corruption and the Anti–Corruption Procedures of the Police Dep't of New York, *Commission Report* 36 (1994) (Milton Mollen, Chair); Myron W. Orfield, Jr., *Deterrence, Perjury, and the Heater Factor: An Exclusionary Rule in the Chicago Criminal Courts,* 63 U. Colo. L.Rev. 75, 107 (1992)(detailing survey of prosecutors, defense lawyers and judges and concluding that perception is that perjury by police is present in approximately 20% of cases); Myron W. Orfield, Jr., *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Nar-*

*cotics Officers,* 54 U. Chi. L.Rev. 1016, 1050–51 & n. 129 (1987)(detailing result of survey of Chicago narcotics officers and their experience with perjury, including belief of 76% of respondents that officers shade facts in suppression hearings to establish probable cause)). The consequences penetrate deep into the criminal justice system, as the authority of the courts and legitimacy of their rulings are based largely on integrity and trust. "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting).

This case, however, is about more than the state of where we stand. This case expands the power of the police to use deceit to avoid a statutorily mandated protection of a constitutional right. This case allows the police to lie with no neutral objective checks, no balances, and no justification.

home.[2] The police accomplished much more than crossing the threshold in this case. They entered the home forcibly and executed the search warrant.

¶ 3 Lacking a factual basis to conclude service of the search warrant was achieved, the Majority writes a new exception to the legislatively mandated service requirement; an exception that is bound to swallow the rule. The Majority today holds that police may use fraud and deception to actively lure an individual from his home, so as not to serve a warrant upon the individual prior to executing the warrant. The Majority puts no restrictions on this power of deception, such as a requirement that the police have a good faith basis that the suspect is armed and dangerous or that some other exigent circumstance exists. Nor does the Majority require judicial oversight. This unbridled exception contravenes over fifty years of statutory law and judicial precedent.

¶ 4 To justify this result, the Majority attacks a straw man, never directly confronting the real issue raised in this appeal. The straw man is a rule requiring personal service of a search warrant on a suspect, even if the suspect is not at home. The Majority refers to this construct as the "strict rule of personal service" and contrasts this "strict rule" to the more flexible approach that accommodates the realities of law enforcement, as set out in our case law.[3] However, Darity does not advocate the "strict rule of personal service" that the Majority so effectively rebuts. Nor do I. The Majority opinion, simply put, resolves a non-issue.

¶ 5 Darity argues, and I strongly recommend, that statutory protections ensuring the constitutional right of citizens to be free from unreasonable searches and seizures, established by our Legislature and interpreted consistently by this Court, be respected and maintained.[4] "[W]here personal service [on a person present, and in control of the premises] is possible the same should be made and substituted service should not be resorted to."[5] Service should be made *prior* to the

---

**2.** *See Jones v. State,* 2006 OK CR 5, ¶ 30, 128 P.3d 521, 537 (finding that tactical team's entry to secure residence, to serve an arrest warrant, and to arrest defendant, so that the search could proceed safely several hours later, was "the initial execution of the search warrant ..." and holding that "service of the search warrant begins once an officer crosses the threshold for the purpose of beginning the search or for securing the residence for a later search").

**3.** *See, for ex.,* Majority Opinion at 8 (*citing State v. Walker,* 1950 OK CR 118, 92 Okla.Crim. 247, 222 P.2d 766, 768) (The strict rule of personal service for which Appellant contends in this case was also rejected expressly in *Walker, supra,* where the Court held that personal service was not required *on the tenant,* in whose name the searched rooms were registered, because the tenant "was at no time *present when the search was made or appeared on the scene* while the same was in progress.") (emphasis in added in Majority). The obvious problem with the Majority's analogy to *Walker,* is that Darity was present at his home when the police initiated contact. He was present and then, *because of police action,* left the premises. The clear difference between *Walker* and this case is that the police were in no way responsible for Walker's failure to obtain service. In Darity, the police were directly responsible. See also Majority Opinion at 13 ("This Court has never held that the Constitution or the Oklahoma Statutes require personal service of a warrant on someone who is not present within the premises to be searched, and we decline to take this extraordinary step now.").

**4.** "It is true ... of journeys in the law that the place you reach depends on the direction you are taking. And so, where one comes out in a case depends on where one goes in. It makes all the difference in the world whether one approaches the Fourth Amendment as the Court approached it in [its prior decisions on the importance of Fourth Amendment protections] or one approaches it as a provision dealing with a formality. It makes all the difference in the world whether one recognizes the central fact about the Fourth Amendment, namely, that it was a safeguard against recurrence of abuses so deeply felt by the Colonies as to be one of the potent causes of the Revolution, or one thinks of it as merely a requirement for a piece of paper." *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting) (citations omitted).

**5.** *Pennington v. State,* 1956 OK CR 98, ¶ 12, 302 P.2d 170, 174.

The Majority implies that the Court's holding in *Pennington* is somehow less persuasive because the Pennington Court relied in part on 37 O.S.1951, § 84, a prohibition statute repealed in 1959, to inform its interpretation of 22 O.S.2001, § 1227. The repeal of 37 O.S.1951, § 84 has no effect on 22 O.S.2001, § 1227.

The Pennington Court applied rules of statutory interpretation to derive the intent of the Legislature in 1951, at the time Section 1227 was passed. The rules teach us that where one statute is silent on a contested issue it is appropriate

execution of the search.[6] An announcement by the police that they possess a warrant does not satisfy the service requirement; a signed copy of the warrant must be provided to the person in control of the premises.[7] If a person absents himself from his home, of his own free will, or hides himself in the home, making himself unavailable, this Court will not hold the police captive and prevent the execution of a warrant.[8] However, to permit police to *cause* a person to exit his home, and then argue that service could not be achieved because the person was not home is a clear abandonment of the rule requiring service.[9] The remarkable distinction is one of nonfeasance and malfeasance.

¶ 6 From the straw man to a monumental leap, the Majority attempts to justify its decision to allow police to use fraud to circumvent service requirements by citing this Court's precedent permitting police to use deception to obtain evidence of criminal

wrongdoing. The Majority focuses on two cases, *Swink v. State* and *Carr v. State*.[10] Neither case permits the result advocated by the Majority. Indeed, a close reading of both cases supports the rejection of the Majority decision today.[11]

¶ 7 In *Swink*, defendant invited undercover officers to his home for a party, and after discussing future drug sales with the officers, handed them a bag of speed. Swink was then arrested. This Court affirmed the trial court's denial of the motion to suppress, emphasizing that the officers (1) were invited into the home and (2) did *not* conduct a search of the home. Because the officers never exceeded the scope of their invitation, and only participated in the activities offered by Swink, no intrusion occurred. The reasoning of *Swink* demonstrates the error of the Darity Majority:

> In short, [*Swink*] involves the exercise of no governmental power to intrude upon

to look to a more specific, related statute and read the two together, to derive legislative intent and harmonize the greater statutory scheme. In looking to other statutes, the Court is, in essence, interpreting the intent of the Legislature at a fixed time. This Court does not have the authority to change its interpretation of a statute every time it suspects the Legislature's policy may have changed.

Adhering to our longstanding interpretation of Section 1227 is no different than our continuing to rely on case law that has been reversed "on other grounds." The reason for repealing 37 O.S.1951, § 84, the abolition of prohibition, does not implicate the Legislature's policies regarding personal service. Indeed, this Court considered and explicitly rejected such an argument in *Knowlton v. State*, 1978 OK CR 11, ¶ 7, 574 P.2d 1059, 1062 (*citing Pennington v. State*, 1956 OK CR 98, 302 P.2d at 174, *Howe v. State*, 1947 OK CR 64, 84 Okla.Crim. 279, 181 P.2d 571 and 79 C.J.S. *Searches and Seizures* § 83(f) (concluding that "there is no significant distinction between the search of a car for contraband liquor and one for stolen property [and t]he general rules for the service and execution of the warrant should be the same in both situations")). *See also Brumfield v. State*, 2007 OK CR 10, ¶ 12, n. 19, 155 P.3d 826, 832 (favorably citing *Pennington*).

In over fifty years of interpreting Section 1227 this Court has found no basis to distinguish the rules for executing a warrant for liquor and a warrant for drugs, and the Court does not attempt to state a basis in this case.

6. *Thompson v. State*, 1949 OK CR 78, 89 Okla. Crim. 383, 208 P.2d 584, 586.

7. *Walker v. State*, 1950 OK CR 118, 92 Okla. Crim. 247, 222 P.2d at 768–69 (citing *Dawson v.*

State, 1946 OK CR 118, 83 Okla.Crim. 263, 175 P.2d 368, 370 (finding search illegal even though officers possessed a valid warrant because warrant was not served upon defendant)); *Denton v. State*, 1937 OK CR 103, 62 Okla.Crim. 8, 70 P.2d 135.

8. *Thompson v. State*, 1949 OK CR 78, 89 Okla. Crim. 383, 208 P.2d at 586 (finding no violation where defendant not served prior to execution of warrant because defendant was hidden away in bed); *Rochon v. State*, 2008 OK CR 1, ¶ 11 and n. 2, 176 P.3d 362, 365 (affirming denial of motion to suppress where police allowed defendant to leave from his home and executed warrant without first serving defendant, where defendant's leaving was not related to any police involvement).

9. Such a conclusion is certainly inconsistent with this Court's holding that "[t]he statutory restrictions surrounding the serving of a warrant in connection with the search of the house of an accused ... should be strictly observed." *Brumfield*, 2007 OK CR 10, ¶ 13, and n. 24, 155 P.3d at 832, and n. 24 (*quoting Kelso v. State*, 1953 OK CR 30, 97 Okla.Crim. 215, 260 P.2d 864, 866) (concerning violations of 22 O.S.2001, § 1228).

10. *Swink v. State*, 1976 OK CR 219, 554 P.2d 795 and *Carr v. State*, 1952 OK CR 112, 96 Okla. Crim. 16, 248 P.2d 251.

11. I will not respond to each of the many cases string-cited by the Majority, but none of those cases stand for the proposition asserted any more than the *Swink* or Carr cases.

protected premises; the visitor was invited and willingly admitted by the suspect. It concerns no design on the part of a government agent to observe or hear what was happening in the privacy of a home; the suspect chose the location where the transaction took place. It presents no question of the invasion of the privacy of a dwelling; the only statements repeated were those that were willingly made to the agent and the only things taken were the packets ... voluntarily transferred to him. The pretense resulted in no breach of privacy; it merely encouraged the suspect to say things which he was willing and anxious to say to anyone who would be interested in purchasing [drugs].[12]

¶ 8 In *Carr*, the police conducted an undercover buy of liquor from a home prior to executing a valid search warrant on that home. In the course of the undercover buy, the police were invited into the premises by defendant's wife. After completing the purchase, the police served the warrant on the wife and then executed the warrant.[13] The

Majority "see[s] no important difference between the diversion used here and the artifice used in *Carr*." [14] The critical distinctions missed by the Majority are that in *Carr*, the police were invited into the home, there was no breaking of any sort, and the warrant was served upon a person in control of the premises, pursuant to Oklahoma law, prior to the search of the premises.

¶ 9 The Majority cites compelling concerns relating to officer and citizen safety. These concerns are implicated each time a warrant is served and a search executed. Recognizing, as we did in *Edwards v. State*, that one of the purposes of serving a warrant is to address safety concerns, and "to lessen the likelihood of resistance to the search and that such interested party may know that the search is by authority of law," [15] the Majority reasons that by causing a person to leave the premises and avoiding service altogether, the police avoid dangers resulting from "unnecessary confrontations" like the tragic shootings of Oklahoma Highway Patrolmen, the Waco massacres and Ruby Ridge.[16] The

---

12. *Swink v. State*, 1976 OK CR 219, ¶ 8, 554 P.2d 795, 798 (*quoting Lewis v. United States*, 385 U.S. 206, 212, 87 S.Ct. 424, 428, 17 L.Ed.2d 312). Citing *Swink*, the Majority argues that no Oklahoma law requires that police always deal truthfully with targets of criminal investigations. This is irrelevant. Oklahoma law does require personal service to be made upon a person in control of a premises prior to execution of a search warrant. Moreover, 22 O.S.2001, § 1240 makes it a crime for a police officer to exceed his authority in executing a search warrant. Arguably, the officers in this case violated Section 1240 as they possessed no authority to conduct the search without prior service of the warrant.

13. *Citing Carr v. State*, 1952 OK CR 112, 96 Okla.Crim. 16, 248 P.2d 251, the Majority stresses that personal service of the warrant on Darity was not required because he was not present when the warrant was executed. Darity never argued that the police would have to serve him, rather than someone else in control of the home, because he was the person charged with the contraband found in the home. Unlike in *Carr*, only Darity was home prior to the police executing the warrant. The police caused Darity to leave his home, and consequently, no one was home to receive the warrant, open the locks, point out the evidence, or assist in anyway in minimizing the intrusion of the police.

14. Majority Opinion at 736. In *Carr*, like in *Swink*, the deception perpetrated related to the identity of the officers, and did not vitiate the

voluntary and consensual nature of the sale of contraband. It is as illegal to sell contraband to police as it is to sell contraband to a civilian. *Carr v. State*, 1952 OK CR 112, 96 Okla.Crim. 16, 248 P.2d at 252 (citations omitted). Critical in *Carr* and in *Swink* was the fact that defendant consented to the intrusion, and the consent was not exceeded.

15. *Edwards v. State*, 1951 OK CR 162, 95 Okla. Crim. 37, 239 P.2d 434, 437 (citations omitted).

16. Majority Opinion at 736. The references to Waco and Ruby Ridge do little to advance this debate. Each of these terrible tragedies arose out of a series of very complicated facts. Extensive Federal hearings were held in each instance, to review the flawed decision making leading up to the shootings. Neither case was thought to have been caused by law enforcement lacking tools of lawful trickery. Furthermore, in each case, respecting the full protections of the law, or obtaining clear, official approval to act in the alternative, would have been the safest path for law enforcement, as severe scrutiny of all decisions was inevitable.

At Ruby Ridge, law enforcement was attempting to serve a bench warrant on Randy Weaver, who failed to appear at a court date. Weaver had become increasingly distrustful of the government, and had not left his cabin in months. Law enforcement engaged in an extensive, expensive surveillance, lasting months, and ultimately cost-

leaps before "if" and between "then" define the flaws in the Majority reasoning. Safety is not the only goal of service, nor is this unchecked grant of power to the police necessary to ensure safety.

¶ 10 Respecting the constitutional rights of citizens to be free from unreasonable searches of their persons, their homes and their property is another critical goal of the service requirement. "The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion and search, has for centuries been protected by every court in the English speaking world, from Magna Charta down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic." [17] Service protects citizens from the harsh intrusion of the State by providing an opportunity to defend against errors in warrants,[18] or to minimize the intrusion of a search by opening doors and locks and by pointing out evidence.[19]

¶ 11 Thus, while serving a warrant of any kind is dangerous, as is much of the work of law enforcement, there must be a balancing of the dangers involved against the rights of persons to be secure in their homes. Our statutes provide for prior service of a search warrant if the resident is home. Similarly, the Legislature addressed concerns about the balance between safety and fourth amendment protections in the context of our knock and announce law. Rather than abandon the knock and announce requirement, the Legislature expanded the avenues for police to seek exception to the knock and announce obligation.[20] This Court *has* and should continue to look to Section 1228 and the larger statutory scheme concerning warrants and service, when interpreting the law of service under Section 1227.[21] Section 1228 provides a reasonable, non-burdensome alternative to this Court's engaging in policymaking or to police disregarding their statutory obligations: police should submit their basis

---

ing upward of $13,000 a week, hoping to bring Weaver to justice. Guns In American Society, An Encyclopedia of History, Politics, Culture and the Law 509 (Gregg Lee Carter ed.2003). *See generally* U.S. Department OF Justice, Office OF Professional Responsibility, Report on Ruby Ridge (*June 10, 1994*), available at http://www.byington.org/Carl/ruby/ruby1.htm. In the end, law enforcement had a choice to continue surveillance, or confront Weaver in his home. Today many question the choice made to confront the family. It is noteworthy that deception was employed as a tactic over the course of the investigation and prosecution in Ruby Ridge. This may have actually increased the level of distrust on the part of Weaver, and decreased his willingness to leave his home peacefully.

In Waco, the ATF chose to execute an arrest and search warrant together, in a large scale raid to disarm the militarized compound. The ATF called press to attend the event. This was the largest scale operation in the history of the ATF. Why they proceeded as they did surely involved many factors. There is no question that informants and other lawful deceptive tactics were employed during the course of the investigation, and no allegation that the ATF was hampered in any way by not having more deceptive tactics available to them. In fact, there is much speculation that the ATF could have arrested Koresh while he was off the compound but choose not to do so.

*See, e.g.,* Joel Rosenbloom III, *Waco: More than Simple Blunders?,* Wall St. J., Oct. 17, 1995, available at http://www.pbs.org/wgbh/pages/frontline/waco/blunders.html. What should have been learned from all of these examples is that

overly aggressive and marginally legal police action puts police officers at great risk and often leads to tragedy and ruined lives. It is critical that police follow the law in executing search warrants. As I note in this writing, our statutes specifically provide for ways to assure the safety of officers, where exigent circumstances exist, with judicial oversight.

17. *Dawson v. State,* 1946 OK CR 118, 83 Okla. Crim. 263, 175 P.2d at 369–370.

18. *Evans v. State,* 2007 OK CR 13, ¶ 3, 157 P.3d 139, 141 (wrong address and description in warrant) and *Goble v. Saffle,* No. 03–6116, 188 Fed. Appx. 723, 2006 WL 1901022, *3–4 (10th Cir. July 12, 2006)(unpublished)(same).

19. *Rochon v. State,* 2008 OK CR 1, ¶ 11 and n. 2, 176 P.3d at 365, and n. 2.

20. *See* 22 O.S.Supp.1999, § 1228(1).

21. *See Thigpen v. State,* 1931 OK CR 232, 51 Okla.Crim. 28, 299 P. 230, where this Court looked to Section 2883, Comp. St.1921, the precursor to 22 O.S.2001 § 1228, to interpret legislative intent relating to service of search warrants. *Thigpen* was recently cited favorably by this Court in *Brumfield v. State,* 2007 OK CR 10, ¶ 12, n. 19, 155 P.3d at 832. See also *Brumfield* at ¶ 12–15, 155 P.3d at 832–833 (describing the Court's consistent use of the exclusionary rule to enforce violations of 22 O.S.2001, § 1228 where no exigent circumstances existed). *See also, supra,* note 5.

for concluding that exigent circumstances exist to a neutral, detached magistrate and obtain written permission in the warrant to avoid the service requirement.[22] Neither the State nor the Majority proffer any reason why this requirement is burdensome.

¶ 12 I write also to express my belief that the sentence imposed upon Darity, life on the Possession with Intent to Distribute charge consecutive to forty years on the Trafficking charge, and one year on the Paraphernalia charge, is excessive considering the facts and circumstances of this case. At age forty-two this was Darity's first arrest; the quantity of drugs possessed speaks of a lower level dealer; the Pastor and fifty-nine members of Darity's church testified at a sentencing hearing, in person or by petition, to Darity's changed, benevolent character; and the professional tasked by the State to make a sentencing recommendation asserted that "a shorter term of incarceration or a split sentence would not tend to depreciate from the seriousness of the crime(s)." The jury possessed none of this information when it recommended the sentence it did. The punishment imposed is not consistent with this nature of the crime committed or the facts presented at the Darity sentencing.[23] We have the authority to make modifications in the interest of justice, where justice demands, and we should do so here.

¶ 13 For the all of the foregoing reasons, I respectfully dissent.

---

**22.** In the present case, Agent Alford did not inform the magistrate about any unique concerns he had relating to Darity. There was no specific allegation that Darity was dangerous, possessed weapons, or was prone to destroy evidence. There was no expressed concern for other persons on the property. There was no request to omit the knock and announce rule. There was no request to avoid or delay service by getting Darity off of the property.

**23.** In effect, the sentence imposed is a life sentence for a man of forty-two years. It is noteworthy that the Legislature enacted mandatory life sentences for convictions of trafficking after *two prior felonies*. 63 O.S.2001, § 2–415(D)(3). Imposing the sentence recommended by the jury, the trial judge stated "[i]f the penalty is excessive that would be up to the Court of Criminal Appeals."